NATIONAL BANK OF COMMERCE *vs.* CHICAGO, BURLINGTON & NORTHERN RAILROAD COMPANY.

SAME *vs.* WISCONSIN CENTRAL COMPANY.

CHICAGO, BURLINGTON & NORTHERN RAILROAD COMPANY *vs.* L. T. SOWLE ELEVATOR COMPANY.

WISCONSIN CENTRAL COMPANY *vs.* SAME.

August 6, 1890.

**Check, when Payment—Presumption.**—A check on a bank is not payment, but is only so when the money is received on it; and there is no presumption that a creditor takes a check in absolute payment arising from the mere fact that he accepts it from his debtor.

**Sale for Cash on Delivery—Payment by Check—Rights of Seller when Check is Dishonored.**—Where goods are sold for cash on delivery, and payment is made by the purchaser by check on his banker, such payment is only conditional, and the delivery of the goods also only conditional; and if the check on due presentation is dishonored, the vendor may retake the goods, even from an innocent subvendee for value, unless he has been guilty of such negligence or laches as would equitably estop him from so doing.

**Carrier—Bill of Lading Issued for Goods not Received—Indorsee for Value.**—*Held, also,* in accordance with the decisions of the federal courts and the great weight of authority elsewhere, that a bill of lading issued by a station or shipping agent of a railroad company or other common carrier, without receiving the goods named in it for transportation, imposes no liability upon the carrier even to an innocent consignee or indorsee for value, and that the carrier is not estopped by the statements in the bill from showing that no goods were in fact received for transportation.

**Same—Defence that Goods were Taken by True Owner.**—The fact that goods were taken from the possession of the carrier by one having title paramount to that of the consignor is a good defence to an action by the consignee or indorsee of the bill of lading for the non-delivery of the property.

On Motion for Reargument, October 1, 1890.

Statute making Bills of Lading "Negotiable."—Gen. St. 1878, c. 124, § 17, does not put bills of lading on the footing of bills of exchange, but merely makes a transfer and delivery of these symbols of property, in the mode therein prescribed, equivalent, for certain purposes, to a transfer and delivery of the property itself. [REP.

These four actions were brought in the district court for Hennepin county. The two first were tried together by *Lochren, J.,* upon whose decision judgment was entered for plaintiff for $1,051 in the first case and for $1,318.53 in the second case, from which judgments the defendants respectively appeal. The two last cases were tried together before *Hooker, J.,* and verdicts of $1,050.10 and $1,345.01 directed for the respective plaintiffs. The defendant appeals from an order in each case refusing a new trial.

*Young & Lightner,* for Chicago, Burlington & Northern R. Co.

*Lusk & Bunn,* for Wisconsin Central Co.

*Jackson & Atwater,* for Nat. Bank of Commerce.

*Hart & Brewer,* for L. T. Sowle Elevator Co.

MITCHELL, J.[1] All of these actions grew out of the same transaction, and involve the same state of facts. They were all determined in the court below upon the same point, viz., the delivery by the defendant elevator company, as vendor, to Moak & Co., as vendees, of certain wheat, the value of which is the subject of the actions. All four appeals may therefore for convenience be considered together.

The first and main question to be considered is whether there had been such a delivery of the wheat in question by the elevator company to Moak & Co. as to pass the title absolutely to the latter. The undisputed facts are substantially these: The defendant elevator company, which appears to have been in the business of buying, selling, and shipping grain, owned and operated a grain elevator in Minneapolis. There were three tracks from the Manitoba railroad to this elevator, designed for the use of the elevator company in its business. One of these ran through the elevator, and

[1] Vanderburgh, J., took no part in this case.

was on the ground of the elevator company. The other two, outside the elevator, belonged to the Manitoba Company, which acted as agent of the other railway companies in switching all their cars to and from the elevator, for which they charged a certain sum per car. The same person, one Dudgeon, acted as the agent of all three railway companies. The two outside tracks referred to were used exclusively for the business of the elevator, unless some special emergency temporarily required some other use. The usual and invariable course of business between the elevator company and the railway companies, as to all cars loaded out of the elevator and placed on these tracks, had been for the elevator company to "card" the cars and give the railway agent the "switch bills" or "shipping orders," and without such switching orders from the elevator company the agent never removed the cars from the Manitoba tracks. This had been the course of business as to all shipments by the elevator company for Moak & Co., the former giving the railway agent a "switch bill," after Moak & Co. had paid for the grain. The elevator company had made certain executory contracts with Moak & Co. for the sale of large quantities of wheat of a specified grade. By the express terms of these contracts, the sales were to be for cash on delivery of the wheat free on board the cars at the elevator. Large deliveries had already been made on these contracts, in all of which the terms concerning cash payment on delivery had been strictly insisted upon and enforced.

On the occasion now under consideration, Moak & Co. notified the elevator company that they desired to ship four cars of the wheat contracted for,—two by each of the railway companies, parties to these actions. Thereupon the elevator company ordered the four cars —two of each company—to be switched into its elevator, and there loaded them with wheat of the specified grade, (which was weighed and inspected by the state officers,) and then caused them to be moved by a Manitoba switch engine out from the elevator, and on to one of the tracks devoted to the use of the elevator business, and there left them standing. This loading was finished on September 14th, and on the same day the elevator company sent written notice to Moak & Co. that they had loaded the cars on their account, giving the num-

ber of each car and the weight and grade of its contents.   Nothing further appears to have been done until September 17th, when the elevator company sent a bill of the wheat to Moak & Co., who gave a check for the amount on their bank, whereupon the elevator company receipted the bill, and delivered it to Moak & Co.   On the same day, Moak & Co. gave shipping orders to the railway agent, and obtained from him bills of lading of the wheat, naming themselves as consignors, and certain parties in Wisconsin and Illinois as consignees, and immediately, or at least the same day, drew their drafts on the consignees, which they sold to the plaintiff bank for value, with the bills of lading attached as security.   These drafts were duly presented but never paid.   The elevator company never "carded" the cars or gave the railway agent any "switch bill" or "shipping orders." The judge who tried the "Bank Cases" finds that Moak & Co. obtained the bills of lading from the railway companies upon presentation of the receipted bill of the wheat from the elevator company, but this is unsupported by evidence, as there is not a particle of testimony that the railway agent ever saw or knew of the existence of this receipted bill.   So far as the railway companies were concerned, the first time Moak & Co. ever appeared in connection with this wheat was when they applied for and received the bills of lading.   Why, or under what circumstances, the railway agent took shipping orders from Moak & Co., instead of from the elevator company, in accordance with the usual course of business, is left wholly unexplained.   On the same day (September 17th) on which the elevator company received the check from Moak & Co. it deposited it with its banker.   This check, according to the usual course of business, passed through the clearing-house, and on the 18th, near noon, was presented at Moak & Co.'s bank for payment, which was refused for want of funds.   It appears that on the 17th, Moak & Co. had in bank sufficient funds to pay the check, but that they had drawn them out on the morning or forenoon of the 18th before the check was presented.   However, no claim is made that there was any undue delay in presenting the check.   On being notified of the dishonor of the check, the elevator company immediately, and on the afternoon of the 18th, caused the four cars (which still stood where they had been placed on the 14th)

to be run back into the elevator, and there unloaded them, claiming the right to do so as unpaid vendor. The bank, claiming the wheat under the bills of lading, sued the railway companies for its non-delivery and recovered, whereupon the railway companies sued the elevator company for the wrongful taking of the wheat and also recovered. In the Bank Cases, which were tried together, the court found that there had been a delivery of the wheat by the elevator company to Moak & Co., by which the title passed to the latter. In the cases against the elevator company, which were also tried together, the court directed verdicts for the plaintiffs, upon the ground, evidently, that in his opinion the evidence showed conclusively that there had been such a delivery. But as the facts are undisputed, and in our opinion present a mere question of law, the difference in the manner in which the cases were disposed of is unimportant. In the Bank Cases the court did not pass upon the question of the effect of the bills of lading upon the liability of the railway companies, but rested its decision entirely upon the delivery of the wheat by the elevator company to Moak & Co.

In the briefs of counsel it is stated that the question in the cases is whether there had been a "delivery" of the wheat by the elevator company to Moak & Co. So general a statement is, we think, both inaccurate and misleading. The word "delivery" is used in different senses; and acts and facts may be sufficient to constitute a delivery for one purpose and not for another purpose. It is not every kind of delivery that will deprive a vendor of the right to retake goods for non-payment of the purchase-money. Where goods are sold for cash, delivery and payment are concurrent conditions, and a delivery in expectation of immediate payment is conditional only; and if payment is not made as agreed, the vendor may reclaim the goods. Hence, the real question in these cases is whether there was an unconditional delivery of the wheat to Moak & Co.; or, otherwise expressed, did the elevator company waive the condition of cash payment on delivery, or accept the check as absolute payment? It had the undoubted right to waive this condition, also to waive payment in cash and accept the check as unconditional payment; but we fail to find anything in the facts to support any such conclusion. Nothing is better settled

than that a check is not payment, but is only so when the cash is received on it.    There is no presumption that a creditor takes a check in payment, arising from the mere fact that he accepts it from his debtor.    The presumption is just the contrary.    Where payment is made by check drawn by a debtor on his banker, this is merely a mode of making a cash payment, and not giving or accepting a security.    Such payment is only conditional, or a means of obtaining the money.    In one sense the holder of the check becomes the agent of the drawer to collect the money on it; and if it is dishonored there is no accord and satisfaction of the debt.    2 Pars. Cont. 623; Benj. Sales, § 731; *Brown* v. *Leckie,* 43 Ill. 497; *Woodburn* v. *Woodburn,* 115 Ill. 427, (5 N. E. Rep. 82;) *Cromwell* v. *Lovett,* 1 Hall, (N. Y.) 56. Where goods are sold for cash on delivery, and payment is made by the purchaser by check on his banker, such payment is only conditional, and the delivery of the goods also only conditional; and if the check on due presentation is dishonored, the vendor may retake the goods. *Hodgson* v. *Barrett,* 33 Ohio St. 63.    Conceding, for the sake of argument, that there was in this case a constructive delivery of the wheat contemporaneously with the receipt of the check, there is an entire absence of evidence to rebut the presumption that it was only conditional upon the check being paid on presentation.    Therefore, upon the dishonor of the check, the right of the elevator company to retake the wheat still continued in full force.

Much stress is laid by counsel, and apparently by the trial court, upon the facts that the elevator company had loaded the wheat into cars of the carriers designated by Moak & Co., and had placed the cars upon the tracks of the Manitoba Company.    It is urged that this amounted to a delivery of the wheat to the railway companies, who thereafter held possession as agents of Moak & Co., for transportation; that the matter of "carding" the cars and furnishing the railway agent with "switch bills" is not material upon the question of possession; that, these things being done after the cars were on the tracks, their only purpose was to furnish the Manitoba Company with vouchers for its switching charges.    But it seems to us that this is putting an erroneous interpretation upon the acts of the elevator company, in view of the customary manner of doing business be-

tween it and the railway companies. Undoubtedly, in furnishing cars to be loaded, and in furnishing these tracks on which to place them after being loaded, the railway companies anticipated that the grain would be delivered for transportation over their roads; and in loading the cars, and setting them out on the tracks specially designed for its business, the elevator company doubtless anticipated the future delivery of this wheat to Moak & Co., and its shipment on their account, and had that end in view. But until the elevator company turned the wheat over to Moak & Co., or turned it over to the railway companies for transportation on account of Moak & Co., the property was still as much in its possession as when in the elevator. All that was done merely amounted to its storing its wheat in the railway cars and on the railway tracks designed for that purpose, preparatory to its shipment or its delivery to the vendees. Until the elevator company turned over control of it to the railway companies for transportation, or to Moak & Co., no one but it, not even the railway companies, had any right to ship out the wheat. The business of the elevator could not be safely conducted on any other basis.

It is clearly evident that the giving of "switch bills" by the elevator company to the railway agent had a double, or perhaps treble, purpose: *First*, to furnish the Manitoba Company with vouchers for its switching charges; *second*, to furnish the agent of the railway companies with evidence of authority of the elevator company to ship the wheat; and, *third*, to furnish him with directions whither and to whom to ship it. It seems to us perfectly clear that, at least up to the 17th, this wheat was in the actual possession and control of the elevator company, and that if there was any delivery of any kind to Moak & Co. on that day, on the receipt of their check, it was only conditional on the check being paid on presentation; and therefore, when the check was dishonored, the elevator company had an undoubted right to retake or retain the wheat, whichever it may be termed.

It is urged that a different rule applies where intermediately the property has been purchased by an innocent subvendee for value. The general rule is that a title, like a stream, cannot rise higher

than its source, and it is difficult to see how a person can communicate a better title than he himself has, unless some principle of equitable estoppel comes into operation against the person claiming under what would otherwise be the better title. We have found no case holding that any different rule obtains in cases like the present, as to a subvendee, than as to the original purchaser, except perhaps that as to the former a waiver of the condition, as for example of payment on delivery, will be more readily inferred from the delivery, especially when the condition is not express but implied. See Benj. Sales, (Am. note,) 269; *Coggill* v. *Hartford & New Haven R. Co.*, 3 Gray, 545; *Hirschorn* v. *Canney*, 98 Mass. 149; *Armour* v. *Pecker*, 123 Mass. 143. It is suggested that Gen. St. 1878, c. 39, § 15, would apply, and that any condition attached to the delivery would be void as against creditors and purchasers, unless the contract is filed. This statute may establish such a rule as to conditional sales, properly so called, where the condition is that the title is to pass, not upon delivery, but upon payment at some subsequent date. But it can have no application to a case like the present, where the terms of sale are cash on delivery, and the only condition attached to the delivery arises from the fact that payment by check is conditional. In such a case, if the check is dishonored, the vendor, if guilty of no fraud or laches which create an equitable estoppel against him, may retake the property even from an innocent subvendee for value. We are not called upon to decide what would have been the effect if any one had dealt with the wheat in reliance upon the acknowledgment of the elevator company, in the receipted bill, that it had been paid for, for there is no evidence that such was the fact. But it is difficult to see how any negligence or laches can be ascribed to the act of a vendor, giving his vendee a receipted bill of the goods upon receiving his check on his banker, which the vendor has every reason to suppose will be paid on presentation. See *Zuchtmann* v. *Roberts*, 109 Mass. 53.

The evidence therefore did not justify the conclusion of the trial judge in the Bank Cases, that there had been a delivery of the wheat so as to pass the title absolutely to Moak & Co., and *a fortiori* it did not justify the direction of verdicts for the plaintiffs in the cases

against the elevator company. Whether the evidence would have justified a finding that there was a constructive delivery at the time the check was taken and the bill receipted, it is unnecessary to decide, for if there was it could only have been, as already stated, a conditional delivery, which did not deprive the elevator company of the right to retake the wheat upon the dishonor of the check. There must be a new trial at least in the cases against the elevator company.

It only remains to consider, in the Bank Cases, the effect of the bills of lading upon the liability of the railway companies to the bank, in case no wheat was in fact ever delivered to them for transportation. Of course, if the wheat was delivered by the elevator company to Moak & Co., and by the latter to the railway companies for transportation, and the agent of the railway companies in good faith issued the bills of lading, the railway companies would not be liable, for it is always a good defence to a carrier, even against an innocent indorsee of the bill of lading, that the property was taken from its possession by one having a paramount title, as was the title of the elevator company in this case as unpaid vendor. A carrier, in issuing a bill of lading for property delivered to him for transportation, does not warrant the title of the shipper. But what is the rule where no property was ever delivered at all for transportation, and the agent of the carrier, either fraudulently or through mistake or negligence, issues a false bill of lading, which passes into the hands of a *bona fide* consignee or indorsee for value? There is an unbroken line of authorities in England that, even as against a *bona fide* consignee or indorsee for value, the carrier is not estopped by the statements of the bill of lading, issued by his agent, from showing that no goods were in fact received for transportation. *Grant* v. *Norway*, 10 C. B. 665; *Coleman* v. *Riches*, 16 C. B. 104; *Hubbersty* v. *Ward*, 8 Exch. 330; *Brown* v. *Powell Coal Co.*, L. R. 10 C. P. 562; *McLean* v. *Fleming*, L. R. 2 H. L. Sc. 128; *Cox* v. *Bruce*, 18 Q. B. Div. 147; *Meyer* v. *Dresser*, 16 C. B. (N. S.) 646; *Jessel* v. *Bath*, L. R. 2 Exch. 267. And this has not been at all changed by the "bills of lading act," (18 & 19 Vict. c. 111, § 3.) It is also the settled doctrine of the federal courts. *Schooner Freeman* v. *Bucking-*

*ham,* 18 How. 182; *The Lady Franklin,* 8 Wall. 325; *Pollard* v. *Vinton,* 105 U. S. 7; *St. Louis, etc., Ry. Co.* v. *Knight,* 122 U. S. 79, (7 Sup. Ct. Rep. 1132;) *Friedlander* v. *Texas & Pac. Ry. Co.,* 130 U. S. 416, (8 Sup. Ct. Rep. 570.) What was said on the subject in *Schooner Freeman* v. *Buckingham* was probably *obiter,* for in that case it was sought to hold the interest of the general owner in a ship liable on a bill of lading issued by the special owner, who was not the agent of the former. But what is there said is important both as being the utterance of so eminent a jurist as Curtis, J., and also because so often quoted with approval by the same court in subsequent cases. The case of *The Lady Franklin* did not involve the question of a *bona fide* purchaser, but is important as announcing that the principle is the same, whether the false bill of lading is issued fraudulently or by mistake. But, in view of the later cases cited above, there is no room to doubt that that court is firmly committed to the doctrine in its broadest scope. The same rule obtains in Massachusetts, Maryland, Louisiana, Missouri, North Carolina; and apparently Ohio. *Sears* v. *Wingate,* 3 Allen 103; *Baltimore & Ohio R. Co.* v. *Wilkins,* 44 Md. 11; *Fellows* v. *Steamer Powell,* 16 La. Ann. 316; *Hunt* v. *Miss. Central R. Co.,* 29 La. Ann. 446; *Louisiana Nat. Bank* v. *Laveille,* 52 Mo. 380; *Williams* v. *Wilmington & Weldon R. Co.,* 93 N. C. 42; *Dean* v. *King,* 22 Ohio St. 118. The text-writers all agree that the overwhelming weight of authority is on this side. See 38 Am. Dec. 410, (note to *Chandler* v. *Sprague.*)

The reasoning by which this doctrine is usually supported is that a bill of lading is not negotiable in the sense in which a bill of exchange or promissory note is negotiable, where the purchaser need not look beyond the instrument itself; that so far as it is a receipt for the goods it is susceptible of explanation or contradiction, the same as any other receipt; that the whole question is one of the law of agency; that it is not within the scope of the authority of the shipping agent of a carrier to issue bills of lading where no property is in fact received for transportation; that the extent of his authority, either real or apparent, is to issue bills of lading for freight actually received; that his real and apparent authority—*i. e.,* the power with which his principal has clothed him in the character in which he is

held out to the world—is the same, viz., to give bills of lading for goods received for transportation; and that this limitation upon his authority is known to the commercial world, and therefore any person purchasing a bill of lading issued by the agent of a carrier acts at his own risk as respects the existence of the fact (the receipt of the goods) upon which alone the agent has authority to issue the bill, the rule being that, if the authority of an agent is known to be open for exercise only in a certain event, or upon the happening of a certain contingency, or the performance of a certain condition, the occurrence of the event, or the happening of the contingency, or the performance of the condition, must be ascertained by him who would avail himself of the results ensuing from the exercise of the authority. An examination of the authorities also shows that they apply the same principle whether the bill of lading was issued fraudulently and collusively, or merely by mistake.

The only states that we have found in which a contrary rule has been adopted are New York, Kansas, Nebraska, apparently Illinois, and perhaps Pennsylvania. *Armour* v. *Mich. Central R. Co.*, 65 N. Y. 111; *Bank of Batavia* v. *New York, etc., R. Co.*, 106 N. Y. 195, (12 N. E. Rep. 433;) *Sioux City & Pac. R. Co.* v. *First Nat. Bank*, 10 Neb. 556, (7 N.W. Rep. 311;) *St. Louis & Iron Mt. R. Co.*v. *Larned*, 103 Ill. 293; *Brooke* v. *New York, etc., R. Co.*, 108 Pa. St. 529, (1 Atl. Rep. 206.) The reasoning of these cases is in substance that the question does not at all depend upon the negotiability of bills of lading, but upon the principle of estoppel *in pais;* that where a principal has clothed an agent with power to do an act in case of the existence of some extrinsic fact, necessarily and peculiarly within the knowledge of the agent, and of the existence of which the act of executing the power is itself a representation, the principal is estopped from denying the existence of the fact, to the prejudice of a third person who has dealt with the agent or acted on his representation in good faith, in the ordinary course of business. This rule this court in effect adopted and applied in *McCord* v. *Western Union Telegraph Co.*, 39 Minn. 181, (39 N. W. Rep. 315, 318.) It is urged that force is added to this reasoning in view of the fact that bills of lading are viewed and dealt with by the commercial world as *quasi* negotiable,

and consequently it is desirable that they should be viewed with confidence and not distrust; and that for these considerations it is better to cast the risk of the goods not having been shipped upon the carrier, who has placed it in the power of agents of his own choosing to make these representations, rather than upon the innocent consignee or indorsee, who, as a rule, has no means of ascertaining the fact.

If the question was *res integra* we confess that it seems to us that this argument would be very cogent. But, on the other hand, it may be said that carriers are not in the business of issuing and dealing in bills of lading in the same sense in which bankers issue and deal in bills of exchange; that their business is transporting property; and that if the statements in the receipt part of bills of lading issued by any of their numerous station or local agents are to be held conclusive upon them, although false, it would open so wide a door for fraud and collusion that the disastrous consequences to the carrier would far outweigh the inconvenience resulting to the commercial world from the opposite rule. It is also to be admitted that it requires some temerity to attack either the policy or the soundness of a rule which seems to have stood the test of experience, which has been approved by so many eminent courts, and under which the most successful commercial nation in the world has developed and conducted her vast commerce ever since the inception of carriers' bills of lading. But on questions of commercial law it is eminently desirable that there be uniformity. It is even more important that the rule be uniform and certain than that it be the best one that might be adopted. Moreover, on questions of general commercial law the federal courts refuse to follow the decisions of the state courts, and determine the law according to their own views of what it is. It is therefore very desirable that on such questions the state courts should conform to the doctrine of the federal courts. The inconvenience and confusion that would follow from having two conflicting rules on the same question in the same state, one in the federal courts and another in the state courts, is of itself almost a sufficient reason why we should adopt the doctrine of the federal courts on this question. To do otherwise, so long as the jurisdic-

tion of those courts so largely depends on the citizenship of suitors, would really result in discrimination against our own citizens. In deference, therefore, to the overwhelming weight of authority, but without committing ourselves to all the reasoning of the decided cases on the subject of the law of agency, we deem it best to hold that a bill of lading issued by a station or shipping agent of a railroad company or other common carrier, without receiving the goods named in it for transportation, imposes no liability upon the carrier, even to an innocent consignee or indorsee for value, and that the rule is the same whether the act of the agent was fraudulent and collusive, or merely the result of mistake. Of course this presumption is predicated upon the assumption that the authority of the agent is limited to issuing bills of lading for freight received before or concurrent with the issuing of the bills, which would be the presumption in the absence of evidence to the contrary. No doubt a carrier might adopt a different mode of doing business by giving his agents authority to issue bills of lading for goods not received, so as to render him liable in such cases to third parties.

In each of the first two cases the judgment, and in each of the last two, the order, appealed from is reversed, and in each of the four cases a new trial is directed.

Ordered accordingly.

———————

A motion for a reargument of the "Bank Cases" was denied October 1, 1890; the following opinion being filed:

MITCHELL, J. The plaintiff in these actions asks for a reargument on the ground that counsel and the court overlooked Gen. St. 1878, c. 124, § 17, which provides that bills of lading or receipts for any goods, wares, merchandise, etc., when in transit by cars or vessels, "shall be negotiable, and may be transferred by endorsement and delivery of such receipt or bill of lading; and any person to whom the said receipt or bill of lading may be transferred shall be deemed and taken to be the owner of the goods, wares, or merchandise therein specified," etc. This statute was not called to our attention upon

the argument, but an examination of it upon this motion satisfies us that it has no bearing upon the questions involved in these cases. It was not intended to totally change the character of bills of lading, and put them on the footing of bills of exchange, and charge the negotiation of them with the consequences which attend or follow the negotiation of bills or notes. On the contrary, we think the sole object of the statute was to prescribe the mode of transferring or assigning bills of lading, and to provide that such transfer and delivery of these symbols of property should for certain purposes be equivalent to an actual transfer and delivery of the property itself. See *Shaw* v. *Railroad Co.*, 101 U. S. 557.

We cannot see that section 471 of the Penal Code, cited in the petition for reargument, has any bearing whatever on the cases. The petition for reargument is therefore denied.