## In re A. O. BROWN & CO.

### (District Court, S. D. New York. February 15, 1911.)

**1. TRUSTS (§ 352\*)—MINGLING OF TRUST FUNDS—REMEDIES OF BENEFICIARY.**

Where a trustee deposits trust funds with his own in a bank, there is no presumption as in case of payments by a debtor that the first money drawn out was the first deposited, but when the rights of the beneficiary require it he may assert a lien upon the entire deposit or any part of it.

[Ed. Note.—For other cases, see Trusts, Cent. Dig. §§ 520–525; Dec. Dig. § 352.\*]

**2. BANKRUPTCY (§ 140\*)—CONVERSION OF PROPERTY BY BANKRUPT—REMEDIES OF OWNER.**

Bankrupts, who were brokers, converted certain stocks owned by claimants, and sold the same, and also other stocks, to a third party, receiving payment by checks given at different times after both sales. They deposited the checks in bank and the proceeds of one was applied to the payment of a note to the bank releasing certain collateral which came into the hands of their trustee. *Held* that, in the absence of evidence showing that the proceeds of claimants' stocks were included in a particular check, there was no presumption that the first check covered the stock first bought, but that the claimants were entitled to a lien on the entire deposit to the extent that their funds contributed to such deposit and to be subrogated to the rights of the bank in the collateral released.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 140.\*]

**8. BANKRUPTCY (§ 140\*)—BROKERS—RECLAMATION OF STOCK DELIVERED FOR SALE.**

Claimant directed bankrupts, who were brokers, through a branch office, to sell certain stock, and being advised that it had been sold she delivered the stock to the manager of the branch office and received a check in payment. Before the check was presented insolvency had intervened, and it was not paid. In fact before claimant delivered the stock bankrupts had sold it, delivering stock of their own, and had received payment therefor. *Held* that, in the absence of fraud, or proof that the check was not good when given, claimant could not rescind and reclaim the stock, which on delivery became the property of bankrupts in any event, even though they converted the proceeds before insolvency.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 140.\*]

**4. APPEAL AND ERROR (§ 204\*)—RECEPTION OF EVIDENCE—EFFECT OF FAILURE TO OBJECT.**

A litigant cannot permit incompetent evidence to be received without objection and then insist on a reversal because of its admission.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 1258–1280; Dec. Dig. § 204.\*]

**5. BANKRUPTCY (§ 214\*)—CONVERSION OF PROPERTY—FOLLOWING TRUST FUNDS.**

Claimant had a lien on a bank deposit of bankrupts for the proceeds of stock converted by bankrupts which went into such deposit. During two days bankrupts made further large deposits, and also drew out the entire fund. With a part of it they paid a note to the bank which was secured by collateral, and with another part they purchased stocks which they deposited as collateral for other loans. *Held* that, to entitle the claimants to follow the fund on which they had a lien into the collateral released by payment of the note or the stocks purchased from the bank deposits, it was incumbent on them to show that up to the time of the payment of the note, or for the stocks, the deposit had remained continuously equal to the amount of their claims so that such payment and purchases were made from the mixed fund, there being no presumption

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

that if such fund had been drawn out prior to such payment or purchases the subsequent deposits were intended to replace it.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 214.*]

**6. BANKRUPTCY (§ 140*)—BROKERS—RIGHT OF CUSTOMER TO RECLAIM STOCKS.**

To entitle claimants, who had delivered stock to bankrupts as brokers, to reclaim similar stocks from the trustee, they must show that after such delivery the bankrupts continuously had on hand a sufficient amount of the same stocks to cover their claims.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 140.*]

**7. BANKRUPTCY (§ 140*)—STOCKBROKERS—CONVERSION OF CUSTOMERS' STOCK —EVIDENCE.**

That bankrupts as brokers sold the particular certificates of stock purchased for a customer does not establish a conversion and entitle the customer to follow the proceeds of such certificates, since all that was required of the bankrupts was that they keep in hand a sufficient amount of the same kind of stock for delivery to the customer.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 140.*]

In the matter of A. O. Brown & Co., bankrupts. On report of referee with respect to claims upon the fund on deposit with the Hanover National Bank. Report confirmed.

See, also, 185 Fed. 972; 189 Fed. 442.

W. B. Crisp, for petitioners.
Ralph Wolf, for trustee.
W. W. Black, for Lannon.
Heyn & Covington, f< Jackson.
K. K. Mackenzie, for Smart.

HAND, District Judge. The distribution of this fund involves a great many different controversies which must be considered separately. I will take them up in the same order as the master.

### Ex parte Schuyler, Chadwick, and Burnham.

The facts are stated in the referee's report very fully. I concur with him in finding that the stocks were procured by fraud, and that therefore the claimants had the right to rescind their contract and follow the stock or its proceeds. I do not concur with the master in finding that the proceeds of the stock were contained in the check for $23,000, if by that he means that there is any evidence that Miller & Co. supposed they were paying for that stock with that check. I think there is no evidence from which it can be determined what was the intent of Miller & Co. in that respect. There is no evidence that the check for $266,600 was paid to the bankrupts before the Interborough stock was delivered. That stock at the latest was delivered at 2 o'clock, and there is no means of placing the time of delivery of the first check before 3 p. m. If the first check was delivered before the stock, the master says that the final $600 may be accounted for by the fact that the price of the Interborough stock was already known, but it is not the custom to pay for any part of stock which has not been delivered. There is no evidence of the time at which the 1,000 shares of Great Northern, or the 1,000 shares of Northern Pacific, stock were delivered. If it be assumed that they and the first check

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

were delivered before the Interborough stock, it would have been an extraordinary thing that the payments made on account of those 2,000 shares of stock should have been in the sum of $600 when the purchase price of neither answered that figure. Any conclusion seems to me necessarily too speculative to be the basis of a decision involving property rights, though if I were forced to such a speculation I should conclude from the amount of the check that all stock deliveries had been made before any check was issued. However, I do not think it necessary to decide that question, because there being no evidence which favors the claimants' construction, it must be taken against him, he having the burden to establish it. I shall therefore assume that all three deliveries of stock preceded that of the first check. 'The obligation of Miller & Co. to pay for all this stock was similar to the obligation of a banker to pay deposits which have been made with him and the case is analogous to those cases in which a trustee mingles in a bank account funds of his own and funds of his beneficiary. The rules affecting withdrawals from such an account I have tried to state in an opinion recently handed down on January 23, 1911, in the suit in the Circuit Court of Primeau v. Granfield, 184 Fed. 480, to which I refer for my reasons, and which I shall here only shortly recapitulate.

[1] In such cases the rule does not obtain which commonly obtains between debtor and creditor; that is, that the earliest payments are to be attributed to the earliest debits. U. S. v. Kirkpatrick, 9 Wheat. 720, 6 L. Ed. 199. On the contrary in cases where the rights of the beneficiary demand it, that rule is abandoned. The case is regarded in this way: All the deposits taken together constitute an obligation of the banker's, a single chose in action, amounting in total to the sum of the deposits. Upon that chose in action the beneficiary has a lien, if he wishes to assert it, equal to the sum of money which his property has contributed to it. So in this case the claimants may, elect to retain a lien upon the total deposit after the first withdrawal. This is the effect of the case of Knatchbull v. Hallett, L. R. 13 Ch. Div. 696, a case which has been very frequently cited and the decision of which has been followed many times. This is sometimes stated as a presumption of the trustee's intent, but that is a fiction.

[2] The result of this is that, had the failure occurred before Miller & Co. had paid the second check, the claimant would have been allowed by a court of equity to assert his lien against the sum of $23,000. However, that sum of $23,000 instead of being represented by a chose in action in which the bankrupts were obligees and Miller & Co. were obligors, was represented by a check for $23,000 which had been paid in discharge of that chose in action and which was in every sense the proceeds of it. The claimants therefore had, at their election, a lien upon that check precisely similar to the lien which they had upon the chose in action, and that lien remained after the bankrupts had deposited it with the Hanover National Bank. The trustee concedes that if once the claimants establish a lien upon that deposit they are entitled to be subrogated to the note held by the bank, which was paid with the deposit, and which was itself secured by certain collateral, which or whose proceeds afterwards came to the hands of the trustee. Therefore, although I do not agree with the

facts upon which the result was reached, I do think that the result was correct.

There remains to be considered whether the intent of Miller & Co. and the bankrupts was so clear to pay for the Interborough stock by the first check that the proceeds of the stock could only have been in the first check. That is not clear. As I have already said, the Interborough stock was probably delivered before the first check was issued, but it does not follow from that that the first check was intended particularly to include that stock. The assistant cashier of Miller & Co. either would not, or could not, state what was the reason for making payment by two checks, and the more natural reason is that there was something in the accounts of the parties which justified the inference that there might be a set-off which required that much at the outside. The retention of that sum of money, for whatever reason it may have been done, would not normally, however, be attributed to any particular one of the three items together creating the obligation. They would probably be regarded as together making one obligation, like deposits in a bank, as I have suggested. Here again the inquiry is necessarily speculative, but in this case the trustee must establish that the first check was intended to include the whole of the stock, and he cannot do it. Instead of that, if there be any conclusion, it must be that Miller & Co. had no specific intention at all, but paid the check generally on their obligation. If their intention was undifferentiated, then there is ground to apply the rule which I have already indicated. The report as to Schuyler, Chadwick and Burnham is therefore confirmed.

## Ex parte Bessie H. Parker, No. 1.

[3] Here, also, the referee has fully stated the facts, and the only question is of their legal result. It is urged that the claimant was not bound by the customs of the New York Stock Exchange, and therefore may not be charged with knowledge that the order to sell her stock would be at once executed by the broker, and the contract of sale filled from their own stock or from other stock which they borrowed for that purpose. I do not think it necessary to determine that question. She certainly knew from the fact that she was dealing with brokers that the transaction was not one of sale between them and her. Moreover, she positively knew when she delivered her stock in Buffalo on the 24th, that it had been sold, because she had received their sale slips. She could hardly suppose that the buyer had advanced the money before getting the stock. The only other possible hypothesis to the facts is that the brokers were advancing her the money. It is of no consequence which she understood for the result is the same upon either hypothesis. I shall first assume that she understood the true facts, which were these: The brokers had received the proceeds from the sale of the stock, which proceeds belonged in equity to the claimant. They had the right to hold those proceeds until they were themselves supplied with stock equal in kind and amount to that which they had sold upon her behalf. In short, the brokers were agents having in their possession property of their

principal upon which they had a lien estimated in shares of stock. There is no proof that the funds which had been received by the brokers from the buyer of the stock did not remain in specie, and were not traceable and accessible to the claimant. She has not, therefore, shown that the bankrupts converted her money. All she was entitled to was that money which was held in trust for her by the brokers. If the check had been paid, it would simply have been one mode of settling with her for the property held in trust. However, there is no presumption that they converted the proceeds, and the claimant would in strictness be obliged to show that they were not in the possession of the receiver before she could rescind. This would be enough to dispose of the present hypothesis. Lest, however, this might result only in an application for a new hearing to supply those facts, I may assume that they did convert the proceeds. In that case the claimant may not rescind under Re Brown, Ex parte First National Bank, 175 Fed. 769, 99 C. C. A: 345. That case is the converse of this, for there the suggestion was that the purchase money could be followed when the stock had been converted, while here it is the proceeds that have been converted, and the stock is to be followed. The cases are to that extent alike.

There is, however, this difference, that here the delivery was made in exchange for a check. The delivery was actually intended to be final. There was no condition annexed to it, though of course the claimant would not have made the delivery had she known that the check would be dishonored. If the delivery had been procured by fraud, then the claimant might rescind, but there was no fraud. So far as appears there were always funds in bank to meet the check. The trouble was that the assignment came in, and sequestrated the funds so that the check could not be paid. There is no case holding that such an event justifies rescission. Undoubtedly, to procure a delivery on a worthless check is a fraud (Keable v. Payne, 8 A. & E. 555; Johnson Co. v. Central Bank, 116 Mo. 558, 22 S. W. 813, 38 Am. St. Rep. 615; Nat. Bank of Commerce v. Chicago, Burlington, & Northern R. R. Co., 44 Minn. 224, 46 N. W. 342, 560, 9 L. R. A. 263, 20 Am. St. Rep. 566; Hodgson v. Barrett, 33 Ohio St. 63, 31 Am. Rep. 527; Matthews v. Cowan, 59 Ill. 341); but those cases are quite different from the case of a good check not presented till after insolvency. In such a case everyone understands that he has no assignment of the fund, unless he gets a certified check, and he assumes the solvency of the maker until he cashes it. While it is a representation that one has funds in bank and will not overdraw one's account, to utter one's check, there is certainly no ground for saying that there is involved any representation of general solvency.

Upon the other hypothesis—that is, that the claimant supposed no sale had yet been made, and no purchase money collected—no different result ensues. The brokers had the right to deliver the stock and get the proceeds. One share of stock is like another, and no one would question that they need not deliver the exact shares which she gave them. If they delivered other shares, after getting hers, they could have appropriated hers. As a fact they had already delivered such

shares in advance and had got the purchase price, which was what she was entitled to. They had already got her the money at their own expense, and they were entitled to recoup themselves. So her shares became absolutely theirs as soon as delivered, whether she knew of the prior sale or not. They had anticipated her orders, and her right was in the purchase price, which is what she meant to get. In short, it makes no difference that the brokers had been more expeditious in executing the order than she supposed. Of course the question remains in this event, as in case she actually knew the facts, whether the delivery was procured by fraud so that she might rescind, but that question I have already considered.

[4] Finally, objection is made to the testimony given from the books. It is enough to say that no such objection was urged at the time when it was offered, and that, had it been taken then, the defects might have been remedied. Nothing can more greatly serve that absurd artificiality of procedure with which so much litigation is burdened, than to allow a litigant to lie by while incompetent, though logically probative, evidence, goes in, and then insist upon a reversal because it was not regular. The rules of evidence are not sacred tables, in the punctilious observance of which courts have an interest independent of the consent of the parties. The time to object is when the proof is offered or not at all. The report is confirmed.

Ex parte First National Bank of Princeton, Ill.
Ex parte William H. Simpson.
Ex parte Frederick J. Bullen.
Ex parte Edgar Perkins.
Ex parte Samuel C. Scotten.
Ex parte Scotten and Snydacker.
Ex parte Martha Leland.
Ex parte Ernest T. Fellows.
Ex parte Henrietta C. Schroeder-Burley.
Ex parte Bessie H. Parker, No. 2.
Ex parte Thomas E. Conklin.

[5] These cases may all be treated as one, because the claimants all seek to make their claims good through the Hanover Bank account into which all their proceeds had gone before August 24th with one exception. On the morning of August 24th that account contained over $130,000, and they had a lien on it for what money of theirs had gone into it, under Knatchbull v. Hallett, supra. On the morning of the 25th the account contained about $6,200, which was at once entirely withdrawn and the account reduced to nothing. The subsequent deposit of $23,000 did not come from the funds of any of the claimants, and there is no presumption that it was intended to be in restoration of the claimants' funds. The claims here must therefore depend upon the transactions of the 24th. On that day over $3,700,-000 was deposited in the account, and over $3,800,000 was withdrawn. The sums withdrawn were used for the most part in the purchase of stocks, the kind and amount of which are known, but the actual destination of which has not been, and cannot apparently be, shown. On

the 24th, the bankrupts paid one loan of $200,000 from this bank account and obtained four loans each secured by specific collateral: one for $80,000, one for $50,000, one for $250,000, one for $8,000. The theory in regard to the payment of the note for $200,000 is this: the agreement between the bankrupts and the bank gave the latter a general lien for all advances upon any collateral in its hands; therefore, the payment of the note by the mingled funds released the collateral pro tanto and the claimants may be subrogated to the surplus. The theory as to the collateral securing the four loans is this: That collateral was bought on the 24th by mingled funds. If the specific collateral was not bought, at least similar stocks were bought. Apparently the reasoning is, that the claimants may elect to regard all their money as going into any investment they choose and then if the stocks bought be mingled with other similar stock, they may elect again to regard the shares pledged as their shares.

There is, however, no theory which does not involve the hypothesis that up to the time of the supposed investment in the stocks in question the fund had remained continuously equal to the amount of the claims. For example although the claimants were all entitled to a lien to the amount of their claims upon the account at the opening of business on the 24th, yet if that account had been at any time that day reduced below that amount, subsequent deposits would not restore to the claimants their rights. There is no presumption of an intent to restore, and in the case at bar it would be an obvious fiction. Now on the 24th the transactions were enormous. Only a part of the stock purchased was of the kind pledged upon these four loans. Indeed there were drawn over $400,000 of checks for other purposes before any check was drawn to pay for any stocks of the kind placed with the loans. It is true that the order of drawing the checks is in no sense the same as the order of presenting them, but the fact mentioned at least shows the possibility. The claimants therefore failed to prove that at the time of the alleged investments any of their money remained in the account, and that is a necessary step in tracing their money into any particular part of the estate. Moreover, even if they could follow any part of their funds into the stocks purchased that day, there is no way of telling whether the collateral pledged was delivered before the supposed purchases or after. If the collateral was pledged before, it would not do to call all the stock, that pledged as well as that free, a single fund upon which the claimants might have a lien. The mingling, which justifies such a rule, must be an actual and indistinguishable mixing into one fund.

Nor is there any presumption in the case that the fund always remained large enough to answer the trust moneys. The very first check drawn was greater than the opening balance and it is the merest speculation to assume what were the deposits or what the amount in the bank's account all day long. While equity will follow funds as long as they can be traced, it always requires affirmative proof by the beneficiary that his money went into some specific thing. Here, that proof would require the claimants at least to show that at the time of each investment which they claim their money was in the bank—I

mean at least that much money. The same reasoning applies as to the payment of the $200,000 note.

I need not therefore consider whether, for the purposes of establishing a lien, the beneficiary may select any earlier withdrawal which went into an investment and which has been preserved. If the general mixed fund has been wholly dissipated, it has been held that he may do so (Re Oatway, 1903, 2 Ch. Div. 356), and that Knatchbull v. Hallett, supra, does not limit him to a lien only where the result will be to prevent his following his money. That presupposes what has not been shown in this case; that is, that the supposed investment was in fact made from a mixed fund. The claimants have throughout assumed that throughout the 24th the fund remained large enough to cover their claims, and it is upon that rock that, in my judgment, their theory is wrecked. The report is confirmed.

Ex parte Scotten.<br>Ex parte Scotten and Snydacker.<br>Claims to Stock in Specie.

[6] These claimants likewise claim some of their stock in specie upon the theory that it must be presumed to be included in some of the collateral found with the bank, 1,000 shares of United States Steel, 3,000 shares of Copper. It is enough that they do not make proof that there was continuously on hand from the time of the receipt of their stocks by the brokers, an amount of stock large enough to cover their claims. It has been decided twice by the Circuit Court of Appeals, Re McIntyre, Ex parte Talbot, 181 Fed. 960, 104 C. C. A. 424, Re Brown, Ex parte Gorman, 184 Fed. 454, that there is no presumption of restoration arising from the presence of similar stock at insolvency. Therefore, it is necessary to show a continuous fund of stock equal to the claimant's.

[7] It is true that there seems to be a general supposition, and indeed this case has proceeded upon that basis, that the sale of the particular certificate purchased for a customer is a conversion and justifies him in following the proceeds. That is not the law. Re McIntyre, Ex parte Nevin, 174 Fed. 627, 98 C. C. A. 381. All a broker need do is to keep on hand enough stock, free or hypothecated for no more than his own lien upon it, to meet his obligations. Strictly speaking, no one of the customer claimants in this case has shown that their stock was converted, for the proof does not formally show that there was not on hand enough stock to meet all orders. This may be assumed, however, for the result is the same in any case.

Ex parte Perkins.

In so far as the master gave this claimant any securities, no objection is made by the trustee and his report is confirmed.

Finally, therefore, the report is confirmed throughout. A docket fee and disbursements are allowed to Schuyler, Chadwick, and Burnham.

Let an order pass as contained above.