### J. P. YOUNG *v.* HARRIS-CORTNER Co. *et al.**

### (*Jackson.* April Term, 1924.)

1. **SALES.** Whether title passed on delivery by seller on receipt of checks for price is question of intention.

Whether title passed on seller's delivery of cotton on receipt of checks for price is question of intentions of parties. (*Post. pp. 22, 23.*)

2. **SALES.** Delivery of cotton on seller's receipt of worthless checks for price held not to effect transfer of title.

Under Uniform Sales Act, section 18, and section 19, rule 1, delivery of cotton to buyer on seller's receipt of checks for price subsequently protested did not effect a transfer of title; the parties having contemplated the exchange of cotton for cash and not an extension of credit. (*Post, p. 22, 23.*)

Acts cited and construed: Acts 1919, ch. 118.

Cases cited and approved: Dillard & Coffin Co. v. Beley Cotton Co., 263 S. W., 87; Nat. Bank of Commerce v. Chicago, etc., Ry. Co., 44 Minn., 224; Johnson-Brinkman Comm. Co. v. Central Bank, 116 Mo., 558; Strother v. McMullen Lbr. Co., 200 Mo., 647; Johnson v.

## (15)

Iankovetz, 57 Or., 24; Bussey v. Barnett, 9 M. & W., 312; Common-wealth v. Devlin, 141 Mass., 423; Hirsch v. Leatherbee Lbr. Co., 69 N. J. Law, 509; Palmer v. Hand, 13 Johns, (N. Y.), 434; Centre-ville Bank v. Boudreaux, 133 La., 75; Morris v. Rexford, 18 N. Y., 552; Wabash Elevator Co. v. First Nat. Bank, 23 Ohio St., 311; Hodgson v. Barrett, 33 Ohio St., 63; Stone v. Perry, 60 Me., 48; Goldsmith v. Bryant, 26 Wis., 34; South San Francisco Packing . Co. v. Jacobsen, 183 Cal., 131; People's State Bank v. Brown, 80 Kan., 520; Mathews v. Cowan, 59 Ill., 341.

Case cited and distinguished; Nat. Bank of Commerce v. Chicago, etc., Ry. Co., 44 Minn., 224.

3. ESTOPPEL. Seller held not estopped on return of checks for price for want of funds to deny buyer's authority to sell to third persons.

Under Uniform Sales Act, section 23, seller who delivered cotton on receipt of checks for price was not estopped, on return of checks for lack of funds, to deny buyer's authority to sell cotton to third persons, in the absence of showing that seller had misled third persons or that third persons had ever known that buyer had received the cotton from such seller; the doctrine of apparent ownership or apparent authority being inapplicable. (*Post, pp.* 23-28.)

Cases cited and approved: Ammon v. Gamble-Robinson Comm. Co., 111 Minn., 452; Thomas v. Farmers' Nat. Bank, 217 S. W., 860.

4. WAREHOUSEMEN. Persons to whom another caused warehouse re-ceipts to be issued held not holders of negotiable receipts acquired in due course for value.

Where buyer, who had procured cotton by delivery of worthless checks, procured issuance of warehouse receipts to third persons, and thereafter transferred receipts to such third persons, the third persons were not holders of negotiable receipts acquired in due course for value within Warehouse Receipts Act, sections 37, 40, 41. (*Post, pp.* 28-33.)

Acts cited and construed: Acts 1909, ch. 336.

---

*Headnotes 1. Sales, 35 Cyc., p. 277; 2. Sales, 35 Cyc., p. 323; 3. Estop-pel, 21 C. J., section 181; 4. Warehousemen, 40 Cyc., p. 423 (1926 Ano-no).

FROM HARDEMAN.

Appeal from the Chancery Court of Hardeman County to the Court of Civil Appeals, and by *certiorari* to the Court of Civil Appeals from the Supreme Court.—Hon. Tom C. Rye, Chancellor.

C. A. Miller and H. E. Carter, for plaintiff.

J. T. Rothrock, Jr., for defendants.

Mr. Justice McKinney delivered the opinion of the Court.

This is a replevin suit, instituted in the chancery court by J. W. Young against Harris-Cortner Company, a partnership, Weil Bros., a partnership, E. M. McNamee, and Hardeman County Farmers' Union Warehouse, a Tennessee corporation, to recover the possession of ten bales of cotton.

The chancellor dismissed complainant's bill, but, upon appeal, the court of civil appeals reversed the chanllor and decreed the cotton to complainant.

The cause is before us upon the petition of Harris-Cortner Company and Weil Bros. for writ of *certiorari*, in which errors are assigned on the decree of the court of civil appeals.

The complainant is a farmer living in Hardeman county. At the time of the transaction here involved McNamee was engaged in buying cotton at Bolivar, Tenn.

Harris-Cortner Company and Weil Bros. were cotton merchants at Decatur and Montgomery, Ala., respectively.

On December 19, 1921, McNamee purchased from complainant ten bales of cotton, for which he was to pay him $713.58 in cash. The sale was had in Bolivar. McNamee executed to complainant his two checks, aggregating the sum of $713.58, on the Bank of Saulsbury, whereupon complainant delivered to him the cotton.

The next day complainant deposited said two checks to his credit in the Bank of Bolivar. In due course the checks were presented to the Bank of Saulsbury, and were protested because McNamee had no funds there to pay same. McNamee had evidently become involved and had absconded.

On the day of the sale McNamee delivered the cotton to the defendant warehouse company and had warehouse receipts issued to Harris-Cortner Company for eight bales and to Weil Bros. for two bales.

Upon this state of facts complainant alleged that the title to the property had not passed because he had not been paid, and he further alleged that McNamee was the agent of Harris-Cortner Company and Weil Bros., and hence he was entitled to the possession of the cotton. He also alleged that, if mistaken as to the alleged agency that Harris-Cortner. Company and Weil Bros., were not innocent purchasers, and had acquired no valid title to the cotton, that would defeat his recovery.

Harris-Corner Company and Weil Bros. filed separate answers in which they insisted that McNamee acquired good title to the cotton; denied that McNamee was their agent; insisted that they purchased said cotton upon the

faith of said warehouse receipts, and that they were *bona-fide* purchasers for value.

1. Did title pass from Young to McNamee at the time of the sale?

So much of our Sales Act (Pub. Acts 1919, chapter 118) as bears upon this question is as follows:

"Sec. 18. (1) Where there is a contract to sell specific or ascertained goods, the property in them is transferred to the buyer at such time as the parties to the contract intend it to be transferred.

"(2) For the purpose of ascertaining the intention of the parties, regard shall be had to the terms of the contract, the conduct of the parties, usages of trade, and the circumstances of the case.

"Sec. 19. . . . Unless a different intention appears, the following are rules for ascertaining the intention of the parties as to the time at which the property in the goods is to pass to the buyer:

"Rule 1: Where there is an unconditional contract to sell specific goods, in a deliverable state, the property in the goods passes to the buyer when the contract is made and it is immaterial whether the time of payment, or the time of delivery, or both be postponed."

After discussing this question from its various standpoints, under the head of "Cash Sales," Mr. Williston, in his work on Sales (1924) vol. 1, p. 811, says:

"Doubtless it is legally possible for the parties to make either a cash sale, where the property does not pass until payment is made, or an immediate transfer of the property, subject to a lien for the price; and the important question which has been little discussed either by courts or text writers is, How is a cash sale to be dis-

tinquished from a sale where the property passes, but possession is not to be given until payment of the price? There is, doubtless, much confusion as to this, arising in large measure from the failure of courts to observe the inconsistency of the early doctrine with the modern law. It is submitted, however, that the true test is this: If the parties when they make their bargain contemplate an exchange of the goods for the price immediately on making the bargain, the sale is to be regarded as a cash sale. There is no occasion to invoke the doctrine of a sale sub ject to a lien. On the other hand, if the parties do not contemplate an immediate exchange of the money for the goods, even though they do contemplate that possession of the goods shall not be delivered until the price is paid, it is presumptively an absolute sale as soon as the parties are agreed on the terms of the bargain and the goods are in a deliverable state in accordance with the rules previously given.

"In case of doubt it seems better to assume that the latter kind of bargain was intended. Transfer of the property subject to a lien gives sufficient protection to the seller and also protects the buyer by giving him the ownership of the goods; whereas, in case of a cash sale he merely has a contract right until the price is paid. In one class of cases, however, it is clear that a cash sale is the true construction of the transaction; that is, sales made by shopkeepers over the counter."

Upon principle we are unable to distinguish the instant cause from that of a sale made over a counter where the seller was induced to accept a check as cash. Such transactions are treated by the authorities as conditional sales; the title not passing until the condition (the pay-

ment of the check) is complied with, or, as stated by Mr. Williston, the purchaser only has a contract right until the price is paid. Upon this question the supreme court of Minnesota says:

"There is no presumption that a creditor takes a check in payment, arising from the mere fact that he accepts it from his debtor. The presumption is just the con- trary. Where payment is made by check drawn by a debtor on his banker, this is merely a mode of making a cash payment, and not giving or accepting a security. Such payment is only conditional, or a means of obtain- ing the money. In one sense the holder of the check be- comes the agent of the drawer to collect the money on it." *National Bank of Commerce* v. *Chicago, etc., Ry. Co.*, 44 Minn., 224, 46 N. W., 342, 560, 9 L. R. A., 263.

Since the intention of the parties controls, it follows that, when it appears that the seller intended to extend credit to the purchaser, the rule would be different and title would pass; as, for example, when the seller accept- ed a bill or check payable in thirty days and delivered possession of the property.

So far as we have been able to investigate this ques- tion the decisions seem to be unanimous in support of the conclusion announced above, as will be seen from an examination of our own case of *Dillard & Coffin Co.* v. *Beley Cotton Co.*, 263 S. W., 87, and the following cases and the authorities cited therein, to-wit: *National Bank of Commerce* v. *Chicago, etc., Ry. Co.*, 44 Minn., 224, 46 N. W., 342, 560, 9 L. R. A., 263, 20 Am. St. Rep., 566; *Johnson-Brinkman Commission Co.* v. *Central Bank*, 116 Mo. 558, 22 S. W., 813, 38 Am. St. Rep., 615; *Strother* v. *McMullen Lumber Co.*, 200 Mo. 647, 98 S. W., 34; *John-*

*son* v. *Iankovetz,* 57 Or., 24, 102 P., 799, 110 P., 398, 29 L. R. A. (N. S.), 709; *Bussey* v. *Barnett,* 9 M. & W., 312; *Commonwealth* v. *Devlin,* 141 Mass., 423, 6 N. E., 64; *Hirsch* v. *Leatherbee Lumber Co.,* 69 N.-J. Law, 509, 55 A., 645; *Palmer* v. *Hand,* 13 Johns. (N. Y.), 434, 7 Am. Dec., 392; *Centreville Bank* v. *Boudreaux,* 133 La., 75, 62 So., 412; *Morris* v. *Rexford,* 18 N. Y., 552; *Wabash Elevator Co.* v. *First National Bank,* 23 Ohio St., 311; *Hodgson* v. *Barrett,* 33 Ohio St., 63, 31 Am. Rep., 527; *Stone* v. *Perry,* 60 Me., 48; *Goldsmith* v. *Bryant,* 26 Wis., 34; *South San Francisco Packing Co.* v. *Jacobsen,* 183 Cal., 131, 190 P., 628; *People's State Bank* v. *Brown,* 80 Kan., 520, 103 P., 102, 23 L. R. A. (N. S.), 824; *Mathews* v. *Cowan,* 59 Ill., 341.

Looking to the intention of the parties, which is the governing principle, we are satisfied that Young purposed to transfer title to the cotton only upon receiving cash therefor. In other words, it was contemplated by the parties that the exchange of the cotton for the cash were to be concurrent acts, and an extension of credit by Young to McNamee was never in the minds of the parties.

We are therefore of the opinion that title to said ten bales of cotton never passed from Young to McNamee.

2. Assuming that Harris-Cortner Company and Weil Bros. purchased said cotton from McNamee in good faith and paid him therefor without knowing that he did not have title to same, was the conduct of Young such as to estop him from denying McNamee's authority to sell; in other words, by placing McNamee in possession of the cotton, did Young thereby clothe him with apparent ownership so as to protect the one who purchased from him in good faith and for value?

Section 23 of our Uniform Sales Act is as follows:

"Be it further enacted, That:   (Sale by a person not the owner.)

"(1) Subject to the provisions of this act, where goods are sold by a person who is not the owner thereof, and who does not sell them under the authority or with the consent of the owner, the buyer acquires no better title to the goods than the seller had, unless the owner of the goods is by his conduct precluded from denying the seller's authority to sell.

"(2) Nothing in this act, however, shall affect:

"(a) The provisions of any factor's acts, recording acts, or any enactment enabling the apparent owner of the goods to dispose of them as if he were the true owner thereof.

"(b) The validity of any contract to sell or sale under any special common law or statutory power of sale or under the order of a court of competent jurisdiction."

Under the facts of this cause we are of the opinion that the doctrine of apparent ownership or apparent authority to sell does not apply.  In this conclusion we find direct or inferential support in the following cases; *National Bank of Commerce* v. *Chicago, etc., Ry. Co.,* supra; *Johnson-Brinkman Commission Co.* v. *Central Bank,* supra; *Johnson* v. *Iankovetz,* supra; *South San Francisco Packing Co.* v. *Jacobsen,* supra; *People's State Bank* v. *Brown,* supra; *Hodgson* v. *Barrett,* supra; *Stone* v. *Perry,* supra.

The mere fact that McNamee, by fraud, procured Young to deliver this cotton to him, and it not appearing that Young was guilty of any act which misled the defendants, subvendees, or that they even knew that

Young had delivered this cotton to McNamee, or that McNamee acquired said cotton from any particular individual or individuals, is not sufficient to estop the complainant.

Numerous circumstances might arise where the seller would be estopped, as for example, where, at the time of the exchange of the goods for the check, the vendor gives to the vendee an absolute bill of sale or assignment of the property upon the strength of which an innocent purchaser acquires same. *Ammon* v. *Gamble-Robinson Commission Co.*, 111 Minn., 452, 127 N. W., 448.

Or where, under such circumstances, the vendor delivers to the vendee a negotiable bill of lading which finds its way into the hands of an innocent purchaser. *Johnson-Brinkman Commission Co.* v. *Central Bank,* supra.

Or where the seller waited an unreasonable time to present his check for payment, and it would have been paid if presented promptly. *Thomas* v. *Farmers' National Bank* (Mo. App., 1920), 217 S. W., 860.

It is said in this case that the complainant was guilty of negligence in presenting his check to such an extent that he should be held estopped. According to his testimony he deposited said check the next day after receiving same. Saulsbury was located twenty-three miles from his home, and, as the court judicially knows, is some distance from Bolivar, and on a different railroad. While this check was not protested by the Bank of Saulsbury until the 29th of December, or eight days after its execution, it does not appear from the record where it was during the interim. It is not unusual for country banks to forward such checks drawn on banks in the same county to their city correspondent for collection, and in this

way the check may have been delayed in reaching the bank on which it was drawn, or it may be that the Bank of Saulsbury held said check with the expectation that the drawer thereof would deposit funds to take care of same. The record is silent as to these matters, and there is no evidence that McNamee had any funds in said bank at the time he drew said check, or subsequently. It does appear from the record that within a few days thereafter he absconded. In these circumstances we do not think the evidence is sufficient to charge the complainant with negligence.

We feel safe in saying that, as a matter of custom and convenience, most of the cash transactions of the country are paid with checks. A farmer brings his cotton, tobacco, or wheat to town for sale and sells same, and, as a general rule, is paid by check, although all of such sales are treated as cash transactions. If, in such a case, the purchaser can immediately resell to an innocent party and convey good title, it would follow that vendors would refuse to accept checks and would require the actual money, which would result in great inconvenience and risk to merchants engaged in buying such produce since it would require them to keep on hand large sums of actual cash. This would result in revolutionizing the custom of merchants in such matters.

As will be noted later in this opinion, the defendants, subvendees, did not purchase this cotton upon the basis of the sale and delivery of same by Young to McNamee, but upon the basis of the warehouse receipts for this and other cotton attached to drafts, which they paid.

In discussing the question with which we are now dealing Mr. Williston, on page 718, says:

"Although intrusting possession to another may lead an innocent third person to believe the possessor is the owner, no court has ever gone so far as to hold that the mere intrusting with possession would preclude the owner from asserting his title. It is an entirely proper thing for the owner of property to intrust another with it either for the advantage of the owner or of the possessor, and the law has never attempted to debar the owner from so doing. He may intrust his goods to another to be repaired or he may lend them to another for the latter's use or he may lease them for hire, and still reclaim them from one who has innocently given value for them to the bailee."

In the note to the foregoing text will be found a long list of cases supporting same.

Mr. Williston further says that possession intrusted to one who habitually sells such goods does not necessarily invest him with apparent ownership so as to protect one who innocently purchases the goods from him; and he illustrates by putting the case of one who sends his watch for repair to a jeweler who habitually sells watches.

He further states that one may be estopped where he not only "intrusts the possession of the goods to another, but either makes or allows to be made written or oral statements inconsistent with any other supposition than that the possessor is the true owner."

Again he says:

"Whether a sale is complete with a lien retained by the seller, or whether the property has not passed, and will not pass until the buyer pays the price, is a question that has some importance when merely the rights of the

buyer and the seller are concerned; for if the property has passed, the risk has been transferred, the seller may sue for the price, and, on the other hand, the buyer may bring trover or replevin for the goods if the seller wrongfully refuses to carry out the bargain.  The greatest importance of the question arises, however, when the rights of third persons are concerned.  If the property does not pass till payment, a purchaser from the buyer gets no title.  Even though the buyer has the goods in his possession and delivers them to the sub-purchaser, this result is necessarily reached unless, as in England, a statute otherwise provides.

"If the condition protecting the seller has been waived by him, as of course it may be, the buyer's title becomes absolute, and may be transferred to a subpurchaser.  The majority of the litigated cases in regard to cash sales involve the question how far the delivery of the goods by the seller to the buyer is a waiver of the condition requiring payment of the price before title is transferred.  There can be no waiver except by the seller's assent.  The mere acquisition of possession by the buyer, therefore, irrespective of the seller's assent, is not a waiver.  Nor is manual possession of the buyer, even with the seller's assent, in itself a waiver.  As a shopkeeper may allow a prospective purchaser to take goods into his hands and examine them before payment, though he does not assent to the removal of them, it is evident that a delivery to the buyer may be itself conditional; that is, merely for a special temporary purpose, such as examination, testing, weighing, or the like.  No assent in such a case to the transfer of the property by the seller can be

found when the original bargain required payment of the price as a condition precedent to such transfer.''

It is possession coupled with *indicia* of title that estops the true owner from asserting claim to the goods.

We have been unable to find a single decision which holds that, where there is no other fact or circumstance that might mislead further than the fact of possession, a purchaser of the goods would be protected against the true owner.

After carefully considering the facts of this cause, we are unable to say that anything that the complainant said or did misled the defendants, subvendees, or was in any wise responsible for their purchase of this cotton.

We hold, therefore, nothing further appearing, that the complainant had a right to replevin this cotton.

3. Are Harris-Cortner Company and Weil Bros. protected by the provisions of the Warehouse Receipts Act (chapter 336, Acts of 1909)? In other words, are they holders of negotiable receipts acquired in due course for value?

It will be assumed, for the purpose of this discussion, that the receipts involved are negotiable.

Section 37 provides how a negotiable receipt may be negotiated, and is as follows:

''Be it further enacted, that a negotiable receipt may be negotiated by delivery:

''(a) Where, by the terms of the receipt, the warehouseman undertakes to deliver the goods to the bearer; or

''(b) Where, by the terms of the receipt, the warehouseman undertakes to deliver the goods to the order of a specified person, and such person or a subsequent

indorsee of the receipt has indorsed it in blank or to bearer. Where, by the terms of a negotiable receipt, the goods are deliverable to bearer or where a negotiable receipt has been indorsed in blank or to bearer any holder may indorse the same to himself or to any other specified person, and in such case the receipt shall thereafter be negotiated only by the indorsement of such indorsee.''

Section 40 provides who may negotiate a receipt, and is as follows:

''Be it further enacted, that a negotiable receipt may be negotiated:

''(a) By the owner thereof, or

''(b) By any person to whom the possession or custody of the receipt has been intrusted by the owner, if, by the terms of the receipt, the warehouseman undertakes to deliver the goods to the order of the person to whom the possession or custody of the receipt has been intrusted, or if at the time of such intrusting the receipt is in such form that it may be negotiated by delivery.''

Under section 41 the rights of persons receiving negotiable receipts are defined as follows:

''Be it further enacted, that a person to whom a negotiable receipt has been duly negotiated acquires thereby:

''(a) Such title to the goods as the person negotiating the receipt to him had or had ability to convey to a purchaser in good faith for value, and also such title to the goods as the depositor or person to whose order the goods were to be delivered by the terms of the receipt had or had ability to convey to a purchaser in good faith for value; and

''(b) The direct obligation of the warehouseman to hold possession of the goods for him according to the

terms of the receipt as fully as if the warehouseman had contracted directly with him.''

The receipts here involved are similar, except as to the description of the cotton, and we here copy the first one exhibited to Mr. Grover's deposition, and what we say with respect to it also applies to the others. It reads as follows:

"Farmers' Union Warehouse Co.

"Bolivar, Tenn., Dec. 19, 1921.

"Received of Harris-Cortner & Co. one bale cotton, marked as stated herein, on storage to be delivered to bearer only upon the return of this receipt and payment of all advances on such charges as may have accrued under the current tariff of this company. Not responsible for loss by fire, acts of Providence, natural shrinkage, old damage, or failure to note concealed damage.

"FARMERS' UNION WAREHOUSE CO.,

"By J. E. WHEELER, Manager.

"Weight 520. Mark K. D. No. 18. Condition good.''

It will be observed that this receipt was issued on the 19th of December, 1921, several days before Harris-Cortner Company purchased the cotton. When they examined the draft and receipt, four or five days later, they discovered, or should have discovered, that the receipt was false because they had not deposited any cotton in said warehouse on said date.

They are not in a position, therefore, to rely upon said receipt because it speaks a falsehood of which they had knowledge.

It is proper to state at this point that immediately upon the delivery of this cotton to McNamee on December 19th he deposited same in the defendant warehouse company,

and had receipts issued to Harris-Cortner Company for eight bales and to Weil Bros. for two bales. It is reasonable to assume that he did this for the purpose of preventing his creditors from seizing same.

According to the testimony of C. W. Grover, chief clerk of Harris-Cortner Company, his firm did not purchase this cotton until several days later than the 19th. We quote from his testimony as follows:

"Q. 2. In what business are you engaged, by whom employed, and what are your duties?

"A. 2. I am chief clerk for Harris-Cortner & Company, cotton merchants at Decatur, Ala. My duties are buying and selling of cotton, paying for the same, shipping, and general supervision of books and detail work in the office at Decatur, Ala.

"Q. 3. State whether or not Harris-Cortner & Co. bought any cotton from E. M. McNamee of Bolivar, Tenn., during the month of December, 1921?

"A. 3. Yes.

"Q. 4. Did they buy the bales of cotton described in the bill of complaint, J. W. Young, marked K. D. 9, 10, 12, 14, 15, 16, 17, and 18?

"A. 4. Yes.

"Q. 5. Did they pay for said cotton?

"A. 5. Yes.

"Q. 6. Did they receive warehouse receipts for said cotton?

"A. 6. Yes.

"Q. 7. I will ask you to file and mark as Exhibits Nos. 1 to 8 the warehouse receipts covering the above-described eight bales of cotton.

"A. 7. I so file.

"Q. 8. Please tell in your own way of your transaction with McNamee concerning the purchase by Harris-Cortner of this cotton?

"A. 8. Samples of this cotton were sent to Harris-Cortner & Co. at Decatur, Ala., by McNamee, and, after the samples were examined, McNamee was telephoned the price, which could be given him for the cotton represented by the samples so submitted, the price was accepted; and invoice rendered and draft or drafts drawn on Harris-Cortner & Co. of Decatur with warehouse receipts attached thereto to cover the amount of his invoice.

"Q. 9. Did you receive the invoices from McNamee covering this eight bales of cotton?

"A. 9. Yes.

"Q. 10. What dates did the said invoices bear and which bales were covered by each of said invoices?

"A. 10. Invoice December 22, 1921, for 17 bales, K. D. 9, 10, 12, 14, 16, 17 and 18; invoices of December 23, 1921, for 26 bales covering bale K. D. No. 15."

The purpose of the act is to protect those who, in good faith and for value, acquire negotiable warehouse receipts by negotiation. This receipt was wrongfully issued to Harris-Cortner Company, except upon the theory that McNamee was their agent.

In any event, it is apparent that said receipt was never negotiated to them in the manner provided by the act.

In our opinion, this transaction does not fall within the provisions of the Warehouse Receipts Act.

We have considered all of the errors assigned by solicitors for the defendants, and find them without merit.

Young v. Harris-Cortner Co.

The court of civil appeals decreed in favor of complainant, but upon different grounds from those stated herein. It follows that the decree of that court, in its results, will be affirmed.