**THOMAS NELSON, INC. and Subsidiary**

v.

**UNITED STATES of America.**

No. 3–86–0671.

United States District Court,
M.D. Tennessee,
Nashville Division.

May 9, 1988.

Jay Bowen, Bass, Berry & Sims, Nashville, Tenn., for plaintiff.

Richard F. Mitchell, Atty., Tax Div., Dept. of Justice, Washington, D.C., Joe B. Brown, U.S. Atty., Carl D. Thoresen, Asst. U.S. Atty., Nashville, Tenn., for defendant.

## MEMORANDUM

JOHN T. NIXON, District Judge.

Plaintiff consolidated taxpayer, Thomas Nelson, Inc. ("TNI") and its subsidiary, Thomas Nelson Publishing Company ("TNP"), brought this action against the defendant United States of America ("the Government") for the recovery of federal income taxes, penalties, and interest paid for the fiscal year ending March 31, 1982. A jury trial was held on February 16–18, 1988. At the close of the evidence, both parties moved for a directed verdict. The Court, agreeing with the parties that a directed verdict is appropriate in this action, removed this case from the jury. In this Memorandum, the Court sets out its findings of fact and conclusions of law.

## FINDINGS OF FACT

TNI is a Tennessee corporation based in Nashville that publishes books. Before 1982, both the production and the sales functions were conducted within TNI. However, after consulting the accounting firm of Touche, Ross & Company ("Touche, Ross"), TNI reorganized in fiscal year 1982, creating TNP as a separate, wholly-owned subsidiary to conduct TNI's sales and marketing functions. TNP maintained its own set of books and records, employed its own group of administrative and marketing employees and independent salespersons, and in every other manner operated as a separate corporation.

During January, February, and March of 1982, the sales subsidiary TNP bought merchandise, primarily books, from its parent, TNI, and sold it to trade customers. Actual physical control of the merchandise did not change until the purchase was made by the trade customer. TNI did not move merchandise out of its warehouse prior to a sale to the trade customer. Instead, TNP received the order and referred it to TNI, which shipped the goods to the customer along with an invoice in the name of TNP. Although TNP received payment from the ultimate customers, TNI was solely responsible for delivery of the books to these customers.

TNI provided general support services to TNP in the areas of warehousing, shipping, and collections, charging TNP the estimated cost of providing these services in the form of a mark-up on the books. On a monthly basis, TNI would bill TNP for the total of all books shipped during the preceding month. TNP would either pay for the books by issuing checks to TNI or by offsetting these accounts payable to TNI with accounts receivable from TNI.

TNI bore the risk of loss until delivery of the books to the customer. TNI maintained the warehouse in which the books were stored, undertook full responsibility for shipping the books, and determined the method of shipment when the customer did not otherwise specify. TNI alone insured the books for safe shipment to the ultimate purchaser. At no time did TNP have physical possession of the merchandise, although the sales of the merchandise were the source of TNP income. TNI used the accrual method of accounting for maintaining its financial records and for reporting its income taxes. Its subsidiary, TNP, also kept its financial records on the accrual method of accounting. At the close of TNI's 1982 fiscal year, Touche, Ross prepared a certified consolidated financial

statement of the companies' books, published in the annual report to shareholders, which puported to "present fairly the financial position" of the companies in conformity with generally accepted accounting principles based on the accrual method.

Despite TNP's use of accrual accounting for financial purposes, TNP used cash basis accounting for reporting taxes on the taxpayer's timely filed consolidated federal income tax return for the fiscal year ending March 31, 1982. This was done based on advice from Touche, Ross that TNP could elect to use the cash method of accounting for tax purposes so long as TNP did not maintain inventories.

The consolidated return is at the heart of this litigation. Apparently, credit routinely is extended in the production and sale of books and related merchandise to trade outlets, so that at any given time much of TNP's current income is tied up in accounts receivable. The sale of merchandise for which proceeds remain uncollected results in different treatment for income computation purposes depending upon which accounting method is used.

Under the accrual method, sales income is recognized when earned, but under the cash method, recognition is postponed until the proceeds are collected. Thus, outstanding receivables of TNP would constitute income under the accrual method of accounting, whereas income would not be recognized under the cash method until TNP actually received payment from trade customers for the merchandise. At the same time, TNP recorded deductions for the cost of the merchandise when TNP actually bought the books from TNI. Thus, TNP claimed that although it had purchased merchandise from its parent TNI in fiscal 1982, much of the income from the sales of the merchandise was not reported because it had not yet been collected.

This mixing of accounting methods for tax purposes, whereby the parent TNI used the accrual method while the subsidiary used the cash method, resulted in the consolidated taxpayer's reporting a consolidated loss for the fiscal year of $2.9 million for tax purposes. However, for financial accounting purposes, the consolidated entity showed income for the same fiscal year of $4.3 million before taxes—a difference of more than $7 million.

After auditing the consolidated return, the Internal Revenue Service ("IRS") assessed deficiencies against the taxpayer for additional income taxes. In addition, the IRS assessed deficiencies against TNI for interest and for penalties, alleging that the income tax deficiencies were attributable to negligence or an intentional disregard of rules or regulations. In support of its assessment of deficiencies, the IRS has alleged that TNP should have used the accrual method of accounting for the following reasons: (1) the cash method of accounting failed to reflect clearly the income of TNP, and (2) because TNP was in the business of buying and selling merchandise, it was required as a matter of law to maintain inventories and to use the accrual method for tax purposes. The taxpayer denies these contentions and, therefore, argues that the assessment of deficiencies, interest, and penalties was improper.

## CONCLUSIONS OF LAW

The standard of review for a directed verdict is whether it is clear that reasonable persons could come to only one conclusion in light of the evidence. *Yung v. Raymark Industries, Inc.,* 789 F.2d 397, 399 (6th Cir.1986); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986) ("the trial judge must direct a verdict if, under the governing law, there can be but one reasonable conclusion as to the verdict").

Conversely, a motion for a directed verdict should not be granted if substantial evidence exists from which a jury could find for the party against whom the motion is made. *Yung,* 789 F.2d at 399; *see also Anderson,* 106 S.Ct. at 2511 (a verdict should not be directed "[i]f reasonable minds could differ as to the import of the evidence").

As the Supreme Court noted in *Anderson:*

Nor are judges any longer required to submit a question to a jury merely be-

cause some evidence has been introduced by the party having the burden of proof, unless the evidence be of such a character that it would warrant the jury in finding a verdict in favor of that party. Formerly it was held that if there was what is called a *scintilla* of evidence in support of a case the judge was bound to leave it to the jury, but recent decisions of high authority have established a more reasonable rule, that in every case, before the evidence is left to the jury, there is a preliminary question for the judge, not whether there is literally no evidence, but whether there is any upon which a jury could properly proceed to find a verdict for the party producing it, upon whom the *onus* of proof is imposed.

*Id.* (quoting *Schuylkill and Dauphin Improvement & Railroad Co. v. Munson*, 81 U.S. (14 Wall.) 442, 448, 20 L.Ed. 867 (1872)). In considering the motion, the court must view the evidence in the light most favorable to the party against whom the motion is made. *Yung*, 789 F.2d at 399. With these standards in mind, the Court now turns to the issues of (1) whether TNP was required, as a matter of law, to use the accrual method of accounting for tax purposes because TNP maintained inventories, and (2) whether the IRS abused its statutory discretion in determining that the cash method did not reflect clearly TNP's taxable income, and in recomputing TNP's income using the accrual method.

### A. *Inventory*

■ The Government asserts that the consolidated taxpayer—that is, both the parent TNI and the sales subsidiary TNP—must use the accrual method of accounting for computation of taxable income for their income tax year 1982.

Section 471 of the Internal Revenue Code ("I.R.C."), 26 U.S.C. § 471, provides:

> Whenever in the opinion of the Secretary the use of inventories is necessary in order clearly to determine the income of any taxpayer, inventories shall be taken by such taxpayer on such basis as the Secretary may prescribe as conforming as nearly as may be to the best account-

ing practice in the trade or business and as most clearly reflecting the income. The regulations promulgated under section 471 require that "[i]n order to reflect taxable income correctly, inventories at the beginning and end of each taxable year are necessary in every case in which the production, purchase, or sale of merchandise is an income-producing factor." Treas.Reg. § 1.471–1. The regulations further provide that if inventories are required, the accrual method must be used with regard to purchases and sales, unless otherwise authorized. *Id.* at § 1.446–1(c)(2)(i).

The reasoning behind this regulatory scheme is straightforward. According to accounting wisdom, the income realized from the sale of merchandise is most clearly measured by matching the cost of that merchandise with the revenue derived from its sale. [citation omitted] In order to achieve such a matching of revenue and cost, it is necessary to keep an inventory account reflecting the costs of merchandise, raw materials, and manufacturing expenses. These costs are not deducted immediately when paid but are deferred until the year when the resulting merchandise is sold.

To make the matching complete, the taxpayer must report income on the accrual method. That method helps to ensure that income from the sale (like the inventory costs) is reflected in the year of the sale. For example, if the sale is made on credit, the accrual method nevertheless treats the income as accrued and reflects it when the sale occurs.

*Knight–Ridder Newspapers, Inc. v. United States*, 743 F.2d 781, 789 (11th Cir.1984). The cash method, on the other hand, "obviously does not reflect the actual sales made during the year where ... a substantial part of these sales ... is made on credit." *Caldwell v. Commissioner*, 202 F.2d 112, 114 (2d Cir.1953). Thus, as a general rule, businesses that sell merchandise must use inventories and the accrual method. *Knight–Ridder*, 743 F.2d at 789.

However, merchandise must be included in the inventory only if title thereto is

vested in the taxpayer. Treas.Reg. § 1.471–1. In this case, the consolidated taxpayer contends that TNP did not have title at any time to the merchandise it bought from TNI, but instead served only in a capacity analogous to that of a middle-man broker between TNI and the ultimate customers. Thus, the taxpayer contends that Treas.Reg. § 1.471–1 did not require TNP to maintain inventories and, therefore, that Treas.Reg. § 1–446–1(c)(2)(i) did not require TNP to use the accrual method.

Clearly then, the resolution of this issue turns on whether TNP ever held title to the merchandise. If so, then TNP's use of the cash method was incorrect as a matter of law. If TNP never held title, then its use of the cash method presumably was proper. Whether TNP held title is governed, in turn, by state law, in this case Tennessee's version of Article 2 of the Uniform Commercial Code, Tenn.Code Ann. §§ 47–2–101 to –210.

The taxpayer asserts that at all times it intended that title to the merchandise would pass, not from TNI to TNP, but directly from TNI to TNP's trade customers. In support of the assertion that TNP, therefore, never held title, the taxpayer has presented the following proof:

1. At page 4 of the minutes of its February 5, 1982 meeting, TNI's Executive Committee stated, "[T]he actual production and inventory functions of the Company [TNI] can be more clearly compared against other similar companies that are not captive to selling organizations." The taxpayer asserts that this statement, discussing the business purpose for forming TNP, sheds light on the fact that TNI and TNP intended and had agreed that title to the merchandise would not pass to TNP.

2. TNI and TNP agreed that TNI would be solely responsible for the shipment of the merchandise to TNP's trade customers.

3. TNI and TNP agreed that TNI would make all decisions regarding the method and timing of shipment.

4. Only TNI maintained insurance on the merchandise during transit, and the risk of loss or damage to the merchandise remained at all times with TNI.

5. TNP never had physical possession of the merchandise or in any manner controlled delivery to customers.

The instant case is strikingly similar to *Epic Metals Corp. v. Commissioner*, 48 T.C.M. (CCH) 357 (1984), *aff'd*, 770 F.2d 1069 (3d Cir.1985). In *Epic Metals*, the parent and the subsidiary filed a consolidated income tax return, attempting to use inconsistent accounting methods. The parent manufactured a product that was then sold by the wholly-owned sales subsidiary. The subsidiary denied that it purchased and resold its parent's product. The subsidiary claimed instead that it was a jobber or middleman, never holding title to the product, but only arranging deals between its parent and third-party customers. Thus, the subsidiary claimed it did not maintain inventories and, accordingly, could use the cash method of accounting for tax purposes instead of the accrual method that it had used for financial reporting.

The Tax Court rejected the taxpayer's contentions as being wholly at odds with the parent and subsidiary's consistent treatment of the transactions as if title passed from the parent to the subsidiary before passing to customers. The court noted that for tax purposes, the parent had treated the transactions with the subsidiary as sales and reported the income therefrom. On the same tax returns, the subsidiary had treated itself as having purchased the goods from the parent, and claimed a deduction for the cost of goods sold. Reasoning that such treatment was entirely inconsistent with the subsidiary's claim that it was merely a jobber, the court concluded that title had passed to the subsidiary, requiring it to use inventories and accrual accounting.

The relevant facts in *Epic Metals* are almost identical to those in the instant case. The subsidiary never had physical possession of the products, and the parent shipped them to the customers. Invoices in the name of the subsidiary were sent to the customers, but the subsidiary never carried the risk of loss or damage to the product during shipment. The documentary evi-

dence in the instant case amply supports the conclusion that sales of merchandise occurred from TNI to TNP. The records of original entry of TNI contain entries for sales of products to TNP. TNP, in its computation of sales and cost of sales for the quarter ending March 31, 1982, included the cost of goods sold to reflect the cost of merchandise TNP had bought from TNI and then sold to customers. Thomas Day Harris, TNI's senior vice president and corporate secretary, and Joe Lloyd Powers, TNI's vice president and treasurer, acknowledged these facts at trial. In addition, Charles E. Frasier, a certified public accountant and expert witness, while disputing the implication that TNP intended to own the merchandise, testified that the designation of "cost of goods sold" in TNP internal memos indicated the amount that TNP had paid to TNI for the merchandise.

For these same reasons, the Court finds, under the standards articulated in *Anderson* and *Yung*, that sufficient evidence exists to direct a verdict for the government on the inventory issue. Given the evidence presented, and in light of the governing law, it is clear that reasonable persons could conclude only that title to the merchandise passed from TNI to TNP and, therefore, that TNP was required to use the accrual method for tax purposes. *See Yung*, 789 F.2d at 399.

The Court notes in passing that the taxpayer based much of its argument on Tenn. Code Ann. § 47–2–401(1), concerning passage of title, which provides generally that "title to goods passes from the seller to the buyer in any manner and on any conditions explicitly agreed on by the parties." The taxpayer argues that under Tennessee law, both before and after enactment of this section, the determination of whether, when, and how title passes between a seller and buyer is governed by the parties' intent. *See Young v. Harris–Cortner Co.*, 152 Tenn. 15, 268 S.W. 125 (1924) (question of whether title passed is one of intention); *Garrett v. American Mutual Liability Insurance Co.*, 261 F.Supp. 161, 165 (E.D. Tenn.1966) (intention of parties controls when title to personalty passes); *Still v. Commerce Union Bank (In re Custom Caps, Inc.)*, 1 B.R. 99, 102 (Bankr.E.D. Tenn.1979) (under Tenn.Code Ann. § 47–2–401 "[t]itle to goods generally passes according to the agreement of the parties"). *See generally* 6 Tenn.Juris., *Commercial Law* § 18 (1983); 3 Anderson, *Uniform Commercial Code* § 2–401:12 at 524 (3d ed. 1983) (question of transfer of title is ordinarily a matter of the intention of the parties).

The Court, however, finds that the taxpayer's reliance on Tenn.Code. Ann. § 47–2–401 is misplaced. Although that section, concerning the "manner" and "conditions" of title passage, controls the question of when and how title passes, the section does not help to answer the initial question of whether title passes. That issue is governed by Tenn.Code Ann. § 47–2–106(1), which states, "A 'sale' consists in the passing of title from the seller to the buyer for a price."

As noted above, the testimony and documentary evidence clearly establish that TNP bought the merchandise in sales transactions from TNI. The taxpayer argues, in effect, that it intended for sales to occur from TNI to TNP without having title pass between them. Under Tenn.Code Ann. § 47–2–106(1), this would be a legal impossibility, because a sale is the passage of title for a price. The taxpayer could not intend for these well-documented sales to occur without having title pass to TNP.

This conclusion is not contrary to the Tennessee cases holding that whether title passes is governed by the parties' intent. *See Young*, 152 Tenn. at 15, 268 S.W. at 125. That proposition is merely a restatement of the basic rule that the parties' intent governs whether a sale has occurred, as it governs the existence of contracts generally. *See, e.g., Price v. Mercury Supply Co.*, 682 S.W.2d 924 (Tenn.App. 1984) (mutual assent is required to establish the existence of a contract). Notwithstanding this rule, the Court finds that the evidence could lead a reasonable person to only one conclusion: The taxpayer intended for sales to occur between TNI and TNP and, thus, title passed to TNP. The assertions by the taxpayer that it did not intend

title to pass to the subsidiary, along with the ambiguous entry in the minutes of TNI's Executive Committee, may present a scintilla of evidence to the contrary. However, the Court finds that under *Anderson*, this evidence could not warrant a jury verdict for the taxpayer. *Anderson*, 106 S.Ct. at 2511 (quoting *Munson*, 81 U.S. (14 Wall.) at 448). Having acknowledged that sales occurred between TNI and TNP, the taxpayer cannot avoid the legal consequences of the transactions simply by stating that it intended to do so. The ability of TNI and TNP to contract between themselves according to their mutual intentions does not include the ability to rewrite the law.

## B. *Clear Reflection of Income*

■ Further, for the reasons stated below, the Court finds that the IRS acted properly in recomputing income using the accrual method pursuant to its power under I.R.C. § 446.

Section 446(a) of the Internal Revenue Code provides: "Taxable income shall be computed under the method of accounting on the basis of which the taxpayer regularly computes his income in keeping his books." However, as an exception to this general rule, I.R.C. § 446(b) further provides that "if the method used does not clearly reflect income, the computation of taxable income shall be made under such method as, in the opinion of the Secretary, does clearly reflect income."

This provision vests broad discretion in the IRS to recompute the taxpayer's income when, in the IRS's view, the taxpayer's method fails to reflect taxable income. *See Thor Power Tool Co. v. Commissioner*, 439 U.S. 522, 99 S.Ct. 773, 58 L.Ed.2d 785 (1979); *Commissioner v. Hansen*, 360 U.S. 446, 467, 79 S.Ct. 1270, 1281, 3 L.Ed.2d 1360 (1959); *Asphalt Products Co. v. Commissioner*, 796 F.2d 843, 847 (6th Cir.1986), *rev'd per curiam in part on other grounds,* —— U.S. ——, 107 S.Ct. 2275, 96 L.Ed.2d 97 (1987). In this case, the IRS has determined that TNP's attempt to use the cash method of accounting failed to reflect its income clearly, and the IRS therefore has recomputed that income us-

ing the accrual method. The taxpayer now has the burden of proving that the IRS's action is "clearly unlawful" or "plainly arbitrary." *Thor Power Tool*, 439 U.S. at 532–33, 99 S.Ct. at 781 (citations omitted); *see also Asphalt Products*, 796 F.2d at 846 ("the taxpayer has a heavy burden to show that the [IRS] has abused [its] discretion"); *Wilkinson–Beane, Inc. v. Commissioner*, 420 F.2d 352 (1st Cir.1970) (taxpayer must demonstrate "substantial identity of results" between his own accounting method and the alternative IRS method).

As the Sixth Circuit held in *Asphalt Products*, I.R.C. § 446 gives the IRS discretion in making two determinations: (1) whether the taxpayer's chosen accounting method clearly reflects income, and (2) if not, what accounting method is required to clearly reflect income. 796 F.2d at 847. The court stated, "It would be difficult to describe administrative discretion in broader terms." *Id.*

Apparently circumscribing this broad interpretation, other courts have stated that when a taxpayer shows that its chosen method clearly reflects income, the IRS does not have the discretion to disturb that choice merely because the IRS considers an alternative method to more clearly reflect income. *See, e.g., Photo–Sonics, Inc. v. Commissioner*, 357 F.2d 656, 658 n. 1 (9th Cir.1966). This may be correct as a general proposition. However, the Court holds to the Sixth Circuit's more specific admonition in *Asphalt Products*, that "[w]here the [IRS] has determined that the accounting method used by a taxpayer does not clearly reflect income, in order to prevail, 'the taxpayer must demonstrate substantial identity of results between his method and the method selected by the [IRS].'" 796 F.2d at 849 (quoting *Wilkinson–Beane*, 420 F.2d at 356). The court further explained that "the requirement that books reflect income 'clearly' means 'accurately,' not just 'fairly and honestly.'" *Asphalt Products*, 796 F.2d at 849.

In the instant case, a substantial identity of results between the cash method of accounting used by TNP and the accrual method imposed by the IRS has not, and

could not, be shown. The evidence clearly establishes that for purposes of financial reporting, the taxpayer reported pre-tax income of $4,358,650. However, once the subsidiary's tax position was computed based upon the cash method of accounting instead of the accrual method of accounting, the consolidated position of the taxpayer became a loss of $2,889,061, a difference of more than $7 million. This constitutes a difference of 166% from the income position to the claimed loss.

The Court agrees with the Government that this claimed loss had no economic basis. The annual report of the taxpayer indicated that the fiscal year in question was both successful and profitable. The only basis for the claimed loss was the accounting procedures stemming from corporation reorganization. Prevention of this type of abuse is a significant reason for providing the IRS such broad authority under I.R.C. § 446(b). Because TNP used the cash method for tax purposes, it treated purchases of merchandise from TNI as the cost of goods sold and claimed a current deduction for them. If TNP did not receive payment for resales to trade customers until succeeding years, the resulting income was deferred.

As Larry Williams of Touche, Ross noted in a letter to Joe Powers dated December 4, 1981, the tax plan chosen "results in the deferral for one year of the taxable income equal to the total of all accounts receivable stemming from sales having been made in the current year but not actually collected in cash until the following taxable year." Williams testified that this deferral could result in a mismatching of income. Further, witness Powers testified that the tax loss reported by the consolidated taxpayer was primarily the result of this deferral of income.

Clearly, if the sales to trade customers had been made directly by TNI, the income could not have been deferred. Likewise, if TNP is required to use the accrual method, the income cannot be deferred. As the court stated in *Epic Metals*, 48 T.C.M. at 362:

The creation of [the subsidiary] to handle certain of the sales of the [merchandise] and its use of the cash method of accounting for tax purposes would result in the deferral of substantial income, and such circumstances provide a sound basis for the [IRS's] position that the deferral of such income would be a failure to clearly reflect income within the meaning of section 446(b).

Further, the court notes that in *Wilkinson–Beane*, 420 F.2d at 352, the First Circuit sustained the IRS decision even though only a few thousand dollars in additional income was generated in each of the years in litigation.

In addition, it is not sufficient that the taxpayer demonstrate that over a series of years added together some identity of result occurs. In his written testimony, Charles Frazier opined that "there was no avoidance of income tax by Thomas Nelson Publishing's adoption of the cash basis method of tax accounting. It merely reflects when the tax is paid, strictly a matter of the timing of the payment of tax, not the ultimate amount of tax which is paid." However, as the court stated in *Fame Tool & Mfg. Co. v. Commissioner*, 334 F.Supp. 23, 30–31 (S.D.Ohio 1971), "[E]ach year's transactions is [sic] to be considered separately without regard to what the net effect of a particular transaction might be if viewed over a period of years," so that the purpose of inventory accounting, "to correctly assign to each annual period its profits and losses," is not frustrated.

TNP used accrual method accounting for its own financial accounting, in accord with generally accepted accounting principles. After TNP reported its income taxes based upon the cash method of accounting, the IRS simply reconverted the tax return to conform with TNP's own financial records, which the independent accounting firm of Touche, Ross stated in the taxpayer's annual report for fiscal 1982 "present[ed] fairly the financial position" of the taxpayer.

In the face of the more than $7 million difference between its stated financial and tax positions for the year in question, the taxpayer has produced no evidence of a

substantial identity of results between the cash and accrual accounting methods that would show the correctness of its tax computations. Thus, given the evidence adduced at trial, the Court finds that under the *Anderson* and *Yung* standards, it is clear that reasonable persons could come to only one conclusion. In determining that the cash method used by TNP did not reflect its income clearly, while the accural method did, the IRS did not act in a manner that was "clearly illegal" or "plainly arbitrary" under *Thor Power Tool.* Because the IRS did not abuse its discretion in redetermining TNP's income using the accrual method under I.R.C. § 446(b), and because TNP was required to use the accrual method under I.R.C. § 471 and related regulations, the Court, in granting the Government's motion on this issue, hereby DIRECTS a verdict for the Government on this issue and DENIES the taxpayer's request for a refund of tax deficiencies assessed against it.

## C. *Penalty and Interest*

■ Section 6653(a) of the Internal Revenue Code authorizes an ad valorem penalty of five percent (5%) of the underpayment of the tax, if any part of the underpayment was due to negligence or intentional disregard of the rules and regulations covering income taxes. I.R.C. § 6653(a). In addition, with respect to the portion of the underpayment that is attributable to the negligence or intentional disregard, a penalty of fifty percent (50%) of the interest attributable to such underpayment is imposed. *Id.* at § 6653(a)(2). The Government asserts that TNP's use of the cash method of accounting constitutes "negligence" as that term is used in these provisions, and has imposed a negligence and interest penalty in this case. The taxpayer asserts that, in light of its reasonable reliance upon the advice of Touche, Ross in selecting the cash method of accounting for TNP for tax purposes, and the authority provided for its position by then-current law, the imposition of the negligence and interest penalty clearly would be improper under the facts of this case. The taxpayer has the burden to prove that it is not liable for the penalty. *Masat v. Commissioner,* 784 F.2d 573 (5th Cir.1986); *Hanson v. Commissioner,* 696 F.2d 1232 (9th Cir. 1983).

■ As an initial matter, the Court addresses the Government's claim that the taxpayer does not have standing to assert its defense of reasonable reliance because the taxpayer did not raise that issue in its original claim for refund at the administrative level, in its complaint, or in the Pretrial Order.

Section 7422(a) of the Internal Revenue Code permits the filing of a tax refund suit only after a claim for refund has been filed in conformity with Treasury Regulations.

Treasury Regulation § 301.6402(b)(1) provides:

> No refund or credit will be allowed after the expiration of the statutory period of limitation applicable to the filing of a claim therefor except upon one or more of the grounds set forth in a claim filed before the expiration of such period. The claim must set forth in detail each ground upon which a credit or refund is claimed and facts sufficient to apprise the Commissioner of the exact basis thereof. The statement of the grounds and facts must be verified by a written declaration that it is made under the penalties of perjury. A claim which does not comply with this paragraph will not be considered for any purpose as a claim for refund or credit.

Generally, if the grounds upon which a claim for a tax refund is made are not set forth specifically in the original administrative claim for refund, the court in a refund action lacks jurisdiction to consider them. *Estate of Bird v. United States,* 534 F.2d 1214, 1219 (6th Cir.1976). The purpose of this requirement is to apprise the IRS of the exact basis of the claim. *See Rogan v. Ferry,* 154 F.2d 974, 975–76 (9th Cir.1946); *see also United States v. Felt & Tarrant Mfg. Co.,* 283 U.S. 269, 272, 51 S.Ct. 376, 377, 75 L.Ed. 1025 (1931).

However, while "it is mandatory that such facts as will clearly demonstrate the nature of the claim" must be included

therein, "[i]t is not necessary that a claimant submit all of his legal arguments in a claim for refund." *Hanna Iron Ore Co. v. United States,* 68 F.Supp. 832, 836 (E.D. Mich.1946). Additionally, while the IRS cannot be expected to discover every claim which a taxpayer might conceivably assert, *see, e.g., Hempt Bros., Inc. v. United States,* 354 F.Supp. 1172, 1182 (M.D.Pa. 1973), *aff'd,* 490 F.2d 1172 (3d Cir.), *cert. denied,* 419 U.S. 826, 95 S.Ct. 44, 42 L.Ed. 2d 50 (1974), in considering a claim for a refund the IRS is required to examine those issues to which its attention necessarily has been directed. *See, e.g., Stroller v. United States,* 444 F.2d 1391 (5th Cir.1971).

Specifically, the Government asserts that the taxpayer's refund claim was based on the contention that its tax return was correct and the deficiency assessment by the IRS was erroneous, not upon a contention of reasonable reliance on expert advice. Thus, the Government contends that because the reliance claim was not timely presented, the Court lacks subject matter jurisdiction over that claim.

However, the Court concludes that it has jurisdiction to hear the reliance claim. It appears to the Court as a matter of simple logic that a claim of reasonable reliance on an accountant is inextricably tied to and subsumed within a claim that the tax return is correct, given the fact that the accountant prepared the return. *See Harlan v. United States,* 312 F.2d 402, 408 (Ct.Cl.1963) (a court may consider the ground for a refund that is fairly comprised within the administrative claim); *Union Pacific Railroad Co. v. United States,* 389 F.2d 437, 442 (Ct.Cl.1968) (a court may consider the ground for a refund that is "comprised within the general language" of the administrative claim).

In *Adams v. United States,* 401 F.Supp. 1142, 1151 (D.Kan.1975), although the Government had questioned the taxpayers' standing to sue for a refund because the taxpayers' claims varied from those presented at the administrative stage, the court proceeded to the merits because both the taxpayers and the Government, at the administrative level and in court, understood each other's contentions and related legal issues, and thus had not been misled. Similarly, the Court finds in the instant case that the purpose of I.R.C. § 7422(a) has been served because the Government has not been misled or prejudiced by the reliance claim. The Court notes that the tax return, which has been in the Government's possession since it was filed and upon which the Government obviously staked its position from the outset, was prepared and signed by the accountant, a fact about which the Government was on notice. Thus, the Government, in reviewing the taxpayer's claim, was apprised sufficiently of the taxpayer's reliance upon the accountant's advice. *See Felt & Tarrant Mfg. Co.,* 283 U.S. at 272, 51 S.Ct. at 377.

Furthermore, because of the obvious interrelationship noted above, the refund claim presently at suit as to the negligence and interest penalty cannot be said to be at "substantial variance" from that presented in the administrative refund claim. *See Cook v. United States,* 599 F.2d 400 (Ct.Cl. 1979). Thus, the Government's reliance on *Salyersville National Bank v. United States,* 613 F.2d 650 (6th Cir.1980), is misplaced. There, the taxpayer bank argued at the administrative level that certain insurance commissions in question should not have been included in its income by the IRS because the taxpayer was forbidden by law from engaging in the insurance business. Later, in its complaint, the taxpayer also asserted the claim, rejected by the court, that it had never received the commissions. Clearly, the rejected claim in *Salyersville National Bank* was factually distinct from and substantially at variance with the earlier claim, unlike the reliance claim in the instant case. For these reasons, the Court finds that it has proper jurisdiction and will proceed to address the merits of the taxpayer's reliance claim.

In general, the standard applied in determining the validity of the imposition of the negligence penalty is whether the taxpayer acted in a manner consistent with that of a reasonable and ordinarily prudent person under the circumstances. *Southeastern Finance Co. v. Commissioner,* 153 F.2d 205 (5th Cir.1946) ("Reasonable cause means nothing more than the exercise of ordinary business care and prudence.")

Thus, the negligence penalty is inapplicable when the taxpayer reasonably has relied upon the advice of a competent accountant in the preparation of its tax returns. *See Industrial Valley Bank and Trust Co. v. Commissioner*, 66 T.C. 272, 283 (1976) ("Reasonable reliance on the advice of an expert suffices to avoid the negligence penalty."); *Conlorez Corp. v. Commissioner*, 51 T.C. 467, 474–75 (1968).

The testimony and documentary evidence clearly show that the taxpayer consulted with and relied upon the advice of its accountant, Touche, Ross, in determining the method by which to report the taxable income of TNP for the fiscal year in question. TNP specifically received and followed the accounting firm's advice in determining those steps that would be necessary to incorporate separately the sales and marketing operations. The Court notes that when Touche, Ross recommended that TNP report its taxable income using the cash method of accounting, the only relevant authority was *Simon v. Commissioner*, 176 F.2d 230 (2d Cir.1949), which appeared to support the use of the cash method. Not until the Tax Court's decision in *Epic Metals* did any case law exist that conclusively undermined the taxpayer's position. *See Sullivan v. Commissioner*, 241 F.2d 46 (7th Cir.1957), *aff'd*, 356 U.S. 27, 78 S.Ct. 512, 2 L.Ed.2d 559 (1958) (negligence penalty inapplicable when the state of the law at the time deductions were taken was not settled as to the treatment of the deductions). In addition, no competent evidence was presented that the taxpayer acted in bad faith, or with negligent or intentional disregard of the rules and regulations in relying on the accountant's advice.

Thus, the Court finds under the standards of *Anderson* and *Yung* that in light of the governing law, a reasonable juror could only conclude that the taxpayer's underpayment of taxes was not due to negligent or intentional disregard of IRS rules and regulations. Accordingly, the Court, in granting the taxpayer's motion on the negligence and interest penalty issue, DIRECTS a verdict for the taxpayer as to the request for a refund of the negligence and interest penalty assessed against it. The Court hereby ORDERS the IRS to refund to the taxpayer all amounts assessed against the taxpayer as a negligence and interest penalty under I.R.C. § 6653.

## SUMMARY

The plaintiff consolidated taxpayer brought this action against the defendant United States of America to recover federal income taxes, penalties, and interest assessed for the fiscal year ending March 31, 1982. A jury trial was held on February 16–18, 1988. Having determined that a directed verdict is appropriate, the Court FINDS as follows: 1) Because the taxpayer used an incorrect accounting method for tax purposes as a matter of law, and because the IRS did not abuse its discretion in recomputing the taxpayer's income, the Court DIRECTS a verdict for the Government on the deficiency issue and DENIES the taxpayer's request for a refund of amounts assessed against it as deficiencies in the payment of taxes; and, 2) because the taxpayer's underpayment of taxes was not caused by negligent or intentional disregard of IRS regulations, the Court hereby DIRECTS a verdict for the taxpayer on this issue and ORDERS the IRS to refund to the taxpayer all amounts assessed against it as negligence and interest penalty under I.R.C. § 6653.

An Order will be entered simultaneously with this Memorandum.